THE TAXPAYERS ASSOCIATION OF WEYMOUTH TOWN-SHIP, INC., *ET AL.*, PLAINTIFFS-RESPONDENTS, v. WEYMOUTH TOWNSHIP, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT, AND SIDNEY SIMON T/A WEYMOUTH PARK ASSOCIATION, AND M & M LAND CO., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.

Argued February 4, 1975—Reargued January 12 and 13, 1976—Decided September 28, 1976.

254

Mr. *Clement F. Lisitski* argued the cause for appellant (*Messrs. Shapiro, Eisenstat, Capizola, O'Neill, Lisitski and Gabage,* attorneys; *Mr. Lisitski* on the brief).

Mr. *David H. Romberger* argued the cause for defendant developers.

*Mr. Morton Feldman* argued the cause for respondents.

*Mr. Kenneth E. Meiser,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Department of the Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Meiser, Mr. Carl S. Bisgaier,* Deputy Director, and *Mr. Peter A. Buchsbaum,* Assistant Deputy Public Advocate, Division of Public Interest Advocacy, Department of the Public Advocate, on the brief).

*Mr. John J. DeVincens* argued the cause for *amicus curiae,* Leisure Technology Corp. (*Messrs. Giordano and Halleran,* attorneys; *Mr. Francis John Badach,* of counsel and on the brief).

The opinion of the court was delivered by

PASHMAN, J. This appeal raises the question whether a zoning ordinance may create a district in which one of the permitted uses is a mobile home park for the exclusive use of the elderly. The Appellate Division disagreed with the determination of the Law Division that such zoning is valid. Because this pattern of zoning developed in a rather roundabout way, it is helpful to state the following chronology and content of the relevant municipal legislation:

Prior to the adoption in 1971 of Ordinances Nos. 172–1971 ("No. 172") and 171–1971 ("No. 171"), whose validity we deal with here, the general zoning ordinance of Weymouth Township, Ordinance No. 144, adopted in 1966, established six zoning districts, one of which was designated "T-Trailer and Mobile Districts." In that district, property was permitted to be used for any use allowed in an R–A Rural Residence District and also for "trailer camps." The ordinance contained specific regulations concerning such camps and the specifications of lots on which mobile homes or trailers could be placed.

Ordinances Nos. 171 and 172, adopted on July 7, 1971 and on June 25, 1971, respectively, were obviously conceived as a single legislative program and intended to be read together, even though No. 171 uses the terminology of Ordinance No. 144 in rezoning the property of the defendant property owner (Block 85, Lots 1, 2 and 3) as a "Trailer and Mobile Home District."

No. 172 is an unusual ordinance. Although its title indicates that it is merely a regulatory ordinance concerning the parking, location and licensing of "mobile home parks," it actually functions as a zoning ordinance as well. Specifically, it prohibits "trailer parks . . . generally" within the township. However, it then provides that, upon recommendation of the planning board and approval by the township committee, mobile home parks may be established on tracts exceeding 140 acres. Moreover, each home site must be at least 5,000 square feet in area (section VI(b)), and no more than 20% of all mobile homes in any park may contain more than two bedrooms. Section XXII. Most important, the ordinance restricts occupancy of all mobile home parks to "elderly persons" or "elderly families." Section XXIII. Elderly persons are defined as persons 52 years of age or over, and elderly families as those "the head of which, or his spouse is 52 years of age or over." Section II. Occupancy of a mobile home or trailer outside an approved mobile home park is prohibited. Section XVII. Only three licenses for a mobile home park are permitted to be outstanding at any one time. Section XXI.

No. 172 also contains a "Declaration of Policy and Purpose," reciting the need for decent, safe and moderately priced housing for the elderly, the suitability of mobile home parks to satisfy this need and the necessity for regulation of such parks by the detailed regulatory and licensing provisions contained in the ordinance. These provisions apparently supersede the regulatory provisions of No. 144 relative to trailers and mobile home residences and parks or camps, although No. 172 states that it is "subject to

the provisions of Ordinance No. 144 and amendments thereto * * *."

The net effect of these ordinances is that defendant property owner's land now constitutes a zoning district which is restricted to use for mobile home parks (whose occupancy is limited exclusively to elderly persons or elderly families), or to any use permissible in an R–A Rural Residential District. Moreover, mobile homes or trailers are not permitted as residences anywhere in the municipality except as homes for the elderly or elderly families.

In July 1971, defendant property owner filed applications for a Mobile Home Park license and for a site plan review with the township committee and the township planning board as required by section V of No. 172. These applications were accompanied by the appropriate tender of fees. Because of the pendency of the instant litigation, no official action has been taken on these applications.

In October 1971, the Taxpayers' Association of Weymouth Township and several of its members who are individual property owners in Weymouth Township filed a joint complaint in lieu of prerogative writ challenging Ordinances Nos. 171 and 172 on a variety of grounds. Essentially, plaintiffs alleged that the ordinances were enacted improperly, have an unconstitutional effect on the rights of children, resulted from an unlawful conspiracy among the defendants and constituted illegal "spot zoning." After trial, the court ruled for defendants on all counts and dismissed the complaint with prejudice.

The Appellate Division reversed in a reported opinion and held that the age limitation of No. 172 was beyond the powers delegated to municipalities by the zoning enabling act, *N. J. S. A.* 40:55–30 *et seq. Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 125 *N. J. Super.* 376 (App Div. 1973). The court also found the ordinance to be an unreasonable exercise of the police power and violative of the equal protection clause of the fourteenth amendment to the federal constitution. We granted the municipality's

petition for certification[1] and joined the case for oral argument with *Shepard v. Woodland Tp. Comm.*, 71 *N. J.* 230 (1976), also decided today, to consider the validity and constitutionality of planned housing developments for the elderly. Because of the broad implications of this case, the Public Advocate and Leisure Technology Corp., a developer of planned housing developments for senior citizens, were permitted to appear as *amici curiae*.

I

We note initially that the trial court properly dismissed the unlawful conspiracy and illegal spot zoning challenges.[2] We also agree with its rejection of the claim that the Weymouth Township ordinances concern matters which should more properly arise through the variance procedure, *N. J. S. A.* 40:55–39(d)[3], and not by amendment to the zoning ordinance. Plaintiffs presented no evidence in support of the first claim and their counsel frankly conceded in his arguments to the trial court that this contention was without factual support. In addition, the trial judge correctly held that the third claim was only a restatement of plaintiffs' allegation of "spot zoning."

"Spot zoning" is the use of the zoning power to benefit particular private interests rather than the collective interests of the community. It is zoning which disregards the requrement of *N. J. S. A.* 40:55–32 that regulation be accomplished in accordance with a comprehensive plan to pro-

---

[1]Defendants Simon and M & M Land Co. did not join in the petition for certification and are not now parties before this Court.

[2]Because it overturned the ordinances on other grounds, the Apellate Division did not reach these issues. It is not entirely clear whether plaintiffs are presenting them before this Court.

[3]This section was recently amended by passage of the Municipal Land Use Law, *N. J. S. A.* 40:55D–1 *et seq. L.* 1975, *c.* 291, § 57. *See* note 4 *infra*.

mote the general welfare. *Palisades Properties, Inc. v. Brunetti,* 44 *N. J.* 117, 134 (1965); *Kozesnik v. Montgomery Tp.,* 24 *N. J.* 154, 172–73 (1957); *Hyland v. Mayor & Tp. Comm. of Morris Tp.,* 130 *N. J. Super.* 470, 477–78 (App. Div. 1974), aff'd o. b. 66 *N. J.* 31 (1974). An ordinance enacted to advance the general welfare by means of a comprehensive plan is unobjectionable even if the ordinance was initially proposed by private parties and these parties are in fact its ultimate beneficiaries. *Kozesnik v. Montgomery Tp., supra,* 24 *N. J.* at 173–74; *Hyland v. Mayor & Tp. Comm. of Morris Tp., supra,* 130 *N. J. Super.* at 478–79.

 Plaintiffs bear the burden of proving that a zoning ordinance constitutes illegal "spot zoning." *Ward v. Montgomery Tp.,* 28 *N. J.* 529, 539 (1959); *Kozesnik v. Montgomery Tp., supra,* 24 *N. J.* at 167. They have not successfully carried that burden in this case. In support of their claim, they could only establish (1) that the defendant property owner had initially suggested to the township committee that his land be rezoned for use as a trailer park and (2) that he would benefit by that rezoning. These isolated facts do not present a prima facie case of "spot zoning." Moreover, the uncontradicted testimony of the municipal officials established that, prior to the adoption of these ordinances, the planning board and the governing body gave conscientious consideration both to the appropriateness of this site as a mobile home park for the elderly and the effect of this use on the general well-being of the community. The law requires no more. *Ward v. Montgomery Tp., supra,* 28 *N. J.* 529.

## II

The more important issues presented in this case were addressed by the Appellate Division in its opinion: whether the ordinances are beyond the authority delegated to mu-

nicipalities by *N. J. S. A.* 40:55–30 *et seq.*[4] and whether they violate principles of substantive due process or equal protection of the law.[5]

## A

### *The Zoning Power*

[6] Zoning is inherently an exercise of the State's police power. *Rockhill v. Chesterfield Tp.,* 23 *N. J.* 117, 124–25 (1957); *Schmidt v. Newark Bd. of Adjustment,* 9 *N. J.* 405, 413–14 (1952); *cf., Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926). Consequently, municipalities have no power to zone except as delegated to them by the Legislature. *J. D. Construction Corp. v. Freehold Tp. Bd. of Adjustment,* 119 *N. J. Super.* 140, 144 (Law Div. 1972); *Kirsch Holding Co. v. Manasquan,* 111 *N. J. Super.* 359, 365 (Law Div. 1970), rev'd on other grounds, 59 *N. J.* 241 (1971); *Piscitelli v. Scotch Plains Tp. Comm.,* 103 *N. J. Super.* 589, 594–95 (Law Div. 1968); *see N. J. Const.* (1947), Art. IV, § VI, par. 2. In this regard, zoning powers are granted to municipalities by the zoning enabling act, *N. J. S. A.* 40:55–30 *et seq.*

---

[4]In addressing this issue, we first observe that on January 14, 1976, following reargument in this case, the Governor signed a comprehensive legislative scheme for the regulation of land use planning and development entitled the "Municipal Land Use Law," *L.* 1975, *c.* 291, *N. J. S. A.* 40:55D–1 *et seq.* This legislation effects a major revision of the former zoning enabling act, *N. J. S. A.* 40: 55–30 *et seq.,* and has direct implications on zoning for planned housing developments for the elderly. *See* Part III *infra.* Nevertheless, for reasons more fully stated in Part IV *infra,* we conclude that The Municipal Land Use Law is not controlling for purposes of the instant litigation, which must be decided on the basis of pre-existing law.

[5]The standing of plaintiffs to raise these issues before this Court has not been challenged by any of the other parties. We therefore have no occasion to consider whether they in fact have a sufficient interest in the outcome of the case to withstand such a challenge.

Ordinances enacted under this grant of power, like other municipal ordinances, are accorded a presumption of validity which can only be overcome by an affirmative showing that the ordinance is arbitrary or unreasonable. *Bow & Arrow Manor v. Town of West Orange,* 63 *N. J.* 335 (1973); *Harvard Enterprises, Inc. v. Madison, Tp. Bd. of Adjustment,* 56 *N. J.* 362, 368 (1970); *Vickers v. Gloucester Tp. Comm.,* 37 *N. J.* 232, 242 (1962), *cert.* den. 371 *U. S.* 233, 83 *S. Ct.* 326, 9 *L. Ed.* 2d 495 (1963); *Ward v. Montgomery Tp., supra,* 28 *N. J.* at 539; *Bellings v. Denville Tp.,* 96 *N. J. Super.* 351, 356 (App. Div. 1967). Nevertheless, municipalities which exercise this power must observe the limitations of the grant and the standards which accompany it. *Kohl v. Mayor & Council of Fair Lawn,* 50 *N. J.* 268, 275 (1967); *Morris v. Postma,* 41 *N. J.* 354, 359 (1964); *Rockhill v. Chesterfield Tp., supra,* 23 *N. J.* at 125; *Garden State Farms, Inc. v. Bay,* 136 *N. J. Super.* 1, 20–21 (Law Div. 1975); *Sussex Woodlands, Inc. v. Mayor & Council of West Milford Tp.,* 109 *N. J. Super.* 432, 437 (Law Div. 1970). Thus, ordinances adopted under the zoning enabling act must bear a real and substantial relationship to the regulation of land within the municipality. *Bridge Park Co. v. Highland Park,* 113 *N. J. Super.* 219 (App. Div. 1971); *Garden State Farms, Inc. v. Bay, supra,* 136 *N. J. Super.* at 20–21; *see generally, Schmidt v. Newark Bd. of Adjustment, supra,* 9 *N. J.* at 416–418. They must also advance one of the several purposes specified in the enabling statute. *N. J. S. A.* 40:55–32.[6] Among these purposes is to "promote . . . the general welfare," a capacious phrase which appears to encompass all the others. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp.,* 67 *N. J.* 151, 175 (1975), appeal dismissed 423 *U. S.* 803, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975).

---

[6]For parallel provisions contained in the new legislation, *see L.* 1975, *c.* 291, §§ 49, 52, 54.

The concept of the general welfare in land use regulation has been given an expansive interpretation by both this Court and the United States Supreme Court. *See, e. g., Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 6, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797, 802 (1974); *Berman v. Parker,* 348 *U. S.* 26, 32–33, 75 *S. Ct.* 98, 99 *L. Ed.* 27, 37–38 (1954); *Kunzler v. Hoffman,* 48 *N. J.* 277, 286–287 (1966); *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough,* 42 *N. J.* 556 (1964); *Black v. Montclair,* 34 *N. J.* 105, 111 (1961); *Andrews v. Ocean Tp. Bd. of Adjustment,* 30 *N. J.* 245 (1959); *Ward v. Montgomery Tp., supra,* 28 *N. J.* 529; *Fanale v. Hasbrouck Heights,* 26 *N. J.* 320 (1958); *Pierro v. Baxendale,* 20 *N. J.* 17, 28–30 (1955); *Lionshead Lake, Inc. v. Wayne Tp.,* 10 *N. J.* 165, 172–174 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953); *Yahnel v. Jamesburg Bd. of Adjustment,* 79 *N. J. Super.* 509, 516–518 (App. Div. 1963), certif. den. 41 *N. J.* 116 (1963); *see generally,* 8 *McQuillin Municipal Corporations* (3 ed. 1965) § 25.20 at 59–60. In this regard, the term is mutable and reflects current social conditions.[7] *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 176–177; *Vickers v. Gloucester Tp. Comm., supra,* 37 *N. J.* at 250; *Pierro v. Baxendale, supra,* 20 *N. J.* at 29; *Fischer v. Bedminster Tp.,* 11 *N. J.* 194, 205 (1952); 8 *McQuillin, supra,* § 25.20 at 60. In today's economic and social setting, the term clearly encompasses the concerns of housing and related needs. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 175, 178–180; *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N. J.* 428, 440–442 (1970); *N. J. Mortgage*

---

[7] Justice Holmes' observation in *Block v. Hirsh,* 256 *U. S.* 135, 155, 41 *S. Ct.* 458, 459, 65 *L. Ed.* 865, 870 (1920), though made in a slightly different context, seems equally applicable to cases of this nature: "Plainly, circumstances may so change in time . . . as to clothe with such an interest what at other times . . . would be a matter of purely private concern."

*Finance, Agency v. McCrane,* 56 *N. J.* 414, 420 (1970) and cases cited; *Oakwood at Madison v. Madison Tp.,* 117 *N. J. Super.* 11, 20 (Law Div. 1971), on remand 128 *N. J. Super.* 438 (Law Div. 1974), appeal pending; *see also, Vickers v. Gloucester Tp. Comm., supra,* 37 *N. J.* at 262–268 (Hall, J., dissenting). In fact, not only do housing needs fall within the purview of the "general welfare," but they have been recognized as "basic" by this Court. As Justice Hall wrote in *Mt. Laurel:*

This brings us to the relation of housing to the concept of general welfare just discussed and the result in terms of the land use regulation which that relationship mandates. There cannot be the slightest doubt that shelter, along with food, are the most basic human needs. *See Robinson v. Cahill, supra* (62 *N. J.* at 483). "The question of whether a citizenry has adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body." *New Jersey Mortgage Finance Agency v. McCrane,* 56 *N. J.* 414, 420 (1970).

[67 *N. J.* at 178–79].

The question therefore arises whether the ordinances under review serve to "promote . . . the general welfare." *Cf. Roselle v. Wright,* 21 *N. J.* 400, 408, 410 (1956). The relationship which the Weymouth ordinances bear to the general welfare can only be appreciated when viewed against the background of larger demographic and social changes that have recently occurred both in New Jersey and in the nation at large.

The United States is experiencing a sharp demographic shift. As a consequence of declining birth rates and longer life expectancies, the elderly are increasing both in absolute numbers and in relative proportion to the total population. In 1950, there were approximately 12.3 million persons over the age of 65 in the United States, comprising 8.2% of the total population. By 1970, these numbers had risen to approximately 20 million, and 9.9% of the total population. *U. S. Bureau of the Census, 1970 Census of the Population, Characteristics of the Population: United States*

*Summary* 1–276 (1973). More recent figures show that this age-group now includes more than 22 million people. If current trends continue, demographers project that there will be more than 29 million Americans over the age of 65 by the year 2000. *Hearings on Specialized Housing and Alternatives to Institutionalization before a Subcomm. of the House Comm. on Gov't Operations,* 93rd Cong., 2d Sess., at 2 (1974). Though the total population grew by one-third between 1950 and 1970, the number of elderly citizens in this country increased by nearly two-thirds. *Ibid.* In the next two decades, it is expected that the number of people between the ages of 65 and 74 will increase by an additional one-third and those 75 years of age and older will increase by 64%. Neugarten, "Age Groups in American Society and the Rise of the Young-Old," *The Annals of the American Academy of Political and Social Sciences* 193 (Sept. 1974). These national trends are reflected in the changing demographic composition of New Jersey as well. In 1950, New Jersey had approximately 394,000 residents over the age of 65, comprising 8.2% of its total population. By 1970, this number had grown to 697,000, and 9.7% of the population. *U. S. Bureau of the Census, 1970 Census of the Population, Characteristics of the Population: New Jersey* 32–64 (1973).

The rapid increase of the elderly population has brought increasing public recognition of the special problems confronting this age group. *See generally,* Older Americans Act of 1965, 42 *U. S. C. A.* §§ 3001 *et seq.; N. J. S. A.* 26:1A–107 *et seq.; N. J. S. A.* 52:27D–28.1 *et seq., L.* 1975, *c.* 36; Senior Citizens' Recreational Opportunities Act of 1968, *N. J. S. A.* 52:27D–29.1 *et seq.;* Retirement Community Full Disclosure Act, *N. J. S. A.* 45:22A–1 *et seq.; White House Conference on Aging, Toward a National Policy on Aging* (1971); *President's Task Force on Aging, Toward a Brighter Future for the Elderly* (1970); "Law and the Aged: Symposium," 17 *Ariz. L. Rev.* 267–545 (1975). Among these problems are the special hous-

ing needs of the elderly. The lack of housing specially designed to meet the needs and desires of the elderly is a matter that has generated increasing public concern at both the national and state levels. *See, e. g., 2 White House Conference on Aging, Toward a National Policy on Aging 29–36 (1971); President's Task Force on Aging, supra at 38–40; Hearings on Adequacy of Federal Response to Housing Needs of Older Americans Before the Subcomm. on Housing for the Elderly of the Senate Special Comm. on Aging, 92nd Cong., 1st Sess., 2nd Sess., 93rd Cong., 1st Sess., 2nd Sess., pts. 1–12 (1972–74); Hearings on Specialized Housing and Alternatives to Institutionalization Before a Subcomm. of the House Comm. on Gov't Operations, supra; N. J. Office on Aging, Proceedings — Aging and Housing Conference (1972); N. J. Office on Aging, A Community Guide: Housing New Jersey's Elderly (1971)* (hereinafter *"Housing New Jersey's Elderly"); Div. of Aging, N. J. Dept. of State, Local Planning for Housing the Elderly (1964); Div. on Aging, N. J. Dep't. of State, Housing for an Aging Population (1962); K. Heintz, Retirement Communities: For Adults Only* (Center for Urban Policy Research, Rutgers Univ., 1976) (soon to be published; hereinafter "Retirement Communities").

In part the need of the elderly for specialized housing results from the fixed and limited incomes upon which many older persons are dependent. In 1970, 82.3% of households in New Jersey with persons over the age of 65 had incomes of less than $10,000 and 62.1% had incomes of less than $5,000. *N. J. Office on Aging, Detailed Housing and Income Information on the Elderly of New Jersey 2 (1973).* By comparison, the median income for all families in New Jersey at that time was $11,407. Because many of the elderly derive their incomes from pensions, social security or other government benefit programs, or from interest on savings or income-producing securities, they are among those hardest hit by inflation and the current

statewide housing shortage. *N. J. Dep't of Community Affairs, The Housing Crisis in New Jersey 1970* (1970). Consequently, many of the elderly cannot afford housing specifically designed for their needs, and in many cases are actually obliged to live in substandard housing. *Housing New Jersey's Elderly, supra* at 3. Many others must devote a disproportionate amount of their available resources to housing costs. *N. J. Office on Aging, Detailed Housing and Income Information on the Elderly of New Jersey, supra* at 4. Moreover, those who are homeowners must often forego proper maintenance and upkeep of their homes. *Retirement Communities, supra* at 2.

In part, though, the need for specialized housing transcends economic status and results from the particular physical and social problems of the elderly. The desirability of housing to meet the special physical needs of the elderly is summarized in a report by the N. J. Office on Aging:

> The needs of the elderly differ from those of the rest of the general populace; muscles and skin become less pliable with increased age, bones become more brittle, and hearing and sight begin to fail. The older person has difficulty in performing normal home maintenance tasks.
>
> To the elderly, accidents in the home are a real danger. Falls, for example, are the leading cause of accidental death for those 65 and over. Throw rugs, stairs and many other objects can cause serious accidents. Older people have different needs, and housing is one area where special consideration must be given. Plans should include more and wider walkways with fewer stairs, an interior and exterior designed to permit easy social contact, provision for common rooms, short distances between buildings, easy refuse collection, little maintenance, and well-lighted walkways and halls.
>
> In addition, housing designed for the elderly should include such facilities as a central dining room, health care facilities and recreational facilities.
>
> [*Housing New Jersey's Elderly, supra* at 4].

*See also N. J. Office on Aging, Proceedings — Aging and Housing Conference, supra* at 37–41.

Though special social and psychological needs of the elderly are perhaps less obvious than their physical needs,

they are no less real. The elderly are apt to be less mobile than younger persons. They may have lost friends and relatives of comparable age and background. As a result, readily accessible companionship becomes increasingly important to them. In addition, the fact that children may have moved away sometimes causes elderly persons to seek an age-homogeneous environment to replace broken family ties. *Retirement Communities, supra* at 3. Such an environment also helps older citizens to adjust to the social and psychological effects of retirement. As one commentator observed:

Obviously, there are economic ramifications involved with retirement, but there are far subtler changes in life-style as well. . . . Retirement signals a change in social status and a need to find fulfillment in what many elderly view as excessive time. As one commentator suggests, the very fact of retirement may create psychological pressures to relocate:

Upon retirement the working man automatically becomes a "senior citizen." Such a change in occupational activity requires the elderly male to face potential embarrassment and loss of status if he remains in the same immediate community, because (1) he usually has a reduced scale of living (less income), (2) he may desire not to be like the other "lost souls" who haunt the shop or campus without purpose or function, and (3) he may experience mental depression brought on by living in the presence of former duties, responsibilities, and active associates. Consequently, retirement by its very nature in American society, creates built-in pressures on the elderly man to change not only his type of housing but its location as well.

If the retiree decides to move, he may seek an adjustment not only in his housing consumption but also in his residential or community environment. He may well seek out a community where leisure is not denigrated and where peer contact is maximized:

\* \* \* \* \* \* \* \*

The importance of the psychological aspects of retirement suggests that retired adults may consider the environmental aspects of housing as much if not more than structural aspects. Thus, leisure oriented, age-defined housing environments are particularly attractive to the retired and elderly.

> [*Retirement Communities, supra* at 3–4;
> footnotes omitted].

In addition, age-homogeneous communities afford a sense of security to their residents and thereby reduce the fear of criminal victimization. Gubrium, "Victimization in Old Age," 20 *Crime and Delinquency,* 245, 247–248 (1974); *cf. The Sunday Newark Star Ledger,* July 18, 1976 at 25, col. 1, citing a recent survey by the Law Enforcement Assistance Administration. Finally, these communities facilitate social relations and increase opportunities for the peer contact which many older persons need and desire. *See N. J. Office on Aging, Proceedings — Aging and Housing Conference, supra* at 36–39, 42.

The elderly, of course, do not constitute a homogeneous group in all respects. They are quite diverse — literally a cross-section of the population as a whole — with needs and desires as varied as those of other segments of society. The common image of the elderly as uniformly sick, isolated, feeble and senile is inaccurate and potentially misleading. *See, e. g., N. J. Office on Aging, Proceedings — Aging and Housing Conference, supra* at 21–27. The solution which is ideal for some senior citizens is apt to be wholly unsatisfactory for others. *See, e. g., N. J. Office on Aging, The Impact of Retirement Communities: Summary Report* 38–43 (1974); *Housing New Jersey's Elderly, supra* at 3. Nevertheless, there are numerous aspects of the problem which are common to a broad cross-section of the elderly. Thus, the Report of the President's Task Force on Aging concludes that

* * * the needs for suitable housing and living arrangements of large numbers of older people differ substantially from those of the general population. Factors contributing to their specialized needs include: reduced income in retirement; loss of activity and social contacts sustained through retirement; declining energy; limited mobility; uncertain health; widowhood; and long-term illness and disability. Many of the elderly, unlike younger families, spend most of 24 hours a day, seven days a week in their housing facilities. The Task Force finds ample evidence of the need for a range of housing and living arrangements suited to particular and varying circumstances of growing numbers of the older population.

For healthy and active older persons housing should offer the options of:
. single, detached, dispersed dwellings, owned or rented
. garden-type or high-rise apartments
. retirement villages
The period of independence of older persons may be extended and the quality of their lives enhanced through provision of limited supportive services in apartments and villages designed especially for their use. Such services may include: congregate dining facilities; social and recreation programs; provision for emergency nursing and housekeeping help; outside maintenance; information and counseling; and transportation to provide for residents ready access to community services and to enable them to participate as fully as they wish in community life.

[*President's Task Force on Aging, supra* at 38]

Because of these special demands and the demographic trends discussed above, there now exists a critical shortage of housing suitable to meet the needs and desires of the elderly. In 1971, the White House Conference on Aging determined that there was a need for 120,000 new units of such housing each year. 2 *White House Conference on Aging, supra* at 32. Thus, Congress has formally declared that:

. . . [T]here is a large and growing need for suitable housing for older people both in urban and rural areas. Our older citizens face special problems in meeting their housing needs because of the prevalence of modest and limited incomes among the elderly, their difficulty in obtaining liberal long-term home mortgage credit, and their need for housing planned and designed to include features necessary to the safety and convenience of the occupants in a suitable neighborhood environment.

[12 *U. S. C. A.* § 1701r].

The New Jersey Legislature has made similar findings with respect to this jurisdiction. *N. J. S. A.* 55:141-2. Defendant's expert witness on housing for the elderly testified that the 1970 census and a 1969 study by the Roman Catholic Diocese of Camden found that in Atlantic County alone there was an unsatisfied need of over 2,800 housing units for the elderly. A 1971 report of the New Jersey Division on Aging further disclosed that nearly 13,000 senior citizens were awaiting vacancies in public housing projects for

the elderly throughout this State. *Div. on Aging, N. J. Dep't. of Community Affairs, Public Housing for the Elderly — Units and Waiting List 3* (1971).

Both the state and federal governments have attempted to solve these problems by legislative enactment. *See, e. g.,* 12 *U. S. C. A.* §§ 1701h–1 (establishing an advisory committee on housing for the elderly), 1701q (providing loans for rental housing), 1701s (authorizing rent supplements for the elderly), 1701z–6 (establishing a research program), 1715v (providing for insurance of mortgages on rental housing); 42 *U. S. C. A.* §§ 1485 (assistance for rural housing), 3012(a)(4) (research program), 3028(a)(1) (demonstration projects); *N. J. S. A.* 55:14I–1 *et seq.* (granting tax exemptions to nonprofit corporations constructing housing for elderly).

The Weymouth Township ordinances attempt to meet some of these same needs at the local level of government. The ordinances permit use of some land in the community for planned mobile home parks for the elderly. The role which mobile home developments can play in satisfying the special needs of the State's senior citizens is evident. First, mobile homes provide a relatively inexpensive form of housing at a time when the demand for such housing is great and its availability is limited:

Nearly 20 per cent of all seniors live in substandard housing. Many pay a higher than normal proportion of their income for rent or property taxes. Some are forced to live with relatives or friends. These elderly people are forced to remain in what many of them consider unsuitable housing arrangements because of the extreme shortage of low-income housing in New Jersey. There is simply nowhere else for them to live.
[*Housing New Jersey's Elderly, supra* at 1].

*See also* Rubinowitz, "Exclusionary Zoning: A Wrong in Search of a Remedy," 6 *Mich. J. L. Reform,* 625, 627 n. 3 (1973). While 94% of all mobile homes sell for less than $10,000, only 6% of new one-family homes sell for under $12,500 and only 1% sell for less than $10,000. Mandelker

& Montgomery, *Housing in America: Problems and Perspectives* 223 (1973). Second, mobile developments afford the elderly the age-homogeneous environment which many older persons now seek and desire. Finally, the size of mobile homes is ideal for older persons with both physical and financial limitations:

> . . . most of the elderly own older urban homes for which the costs of maintenance and rehabilitation are substantial. Consequently, many of these homes are in disrepair and create physical hazards for the elderly. The elderly in these older, urban residences clearly need access to alternative housing which would require less maintenance and which would be of a size appropriate for their small households, averaging 2.2 persons.
>
> [*Retirement Communities, supra* at 2; footnote omitted]

 Therefore, while mobile homes have traditionally been a disfavored form of development among local zoning authorities,[8] their inexpensiveness, compact size and easy maintenance give them special and growing appeal among older citizens who are in need of housing. Studies of elderly persons living in mobile home parks indicate that they are generally satisfied with this form of housing. Drury, *Mobile Homes: The Unrecognized Revolution in American Housing* 64–70 (Rev. ed. 1972). Between 1960 and 1970, the percentage of senior citizens owning mobile homes increased from 1% to 4%; in addition, the percentage of those renting mobile homes rose from .4% to 1%. Golant, "Residential Concentrations of the Future Elderly," 15 *The Gerontologist* 16, 20 (Supp. Feb. 1975). Thus, the future use of mobile home parks to provide specialized housing for the elderly seems to be neither unreasonable nor impractical. *See generally, N. J. Office on Aging, Study on Mobile Homes*

---

[8]*See, e. g., Vickers v. Gloucester Tp. Comm., supra*, 37 *N. J.* 232; *Napierkowski v. Gloucester Tp.*, 29 *N. J.* 481, 492–93 (1959) and authorities cited; *but see Bristow v. City of Woodhaven*, 35 *Mich. App.* 205, 192 *N. W.* 2d 322 (App. Ct. 1971) (calling mobile homes a "preferred or favored" use).

*for Senior Citizens* (1974) and Mandelker & Montgomery, *supra* at 223, noting that mobile homes are "becoming a a significant factor in providing housing for the elderly." Moreover, as noted above, the concept of the "general welfare" in land use regulation is quite expansive, and encompasses the provision of housing for *all categories of people,* including the elderly.[9] *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 179.

We therefore conclude, for all the above reasons, that the Weymouth Township ordinances clearly promote the general welfare and hence fall well within the purview of the zoning enabling act.[10] *N. J. S. A.* 40:55–32.

In view of our conclusion, a brief comment on the reasoning of the Appellate Division appears to be in order. The principal ground cited by the Appellate Division in invalidating these ordinances is that zoning which restricts housing units to a particular age group does not concern

---

[9]While the demand in Weymouth Township for housing for the aged appears to be relatively small, though not nonexistent, the testimony of defendants' expert indicates that there is a substantial demand for such housing in the surrounding region. Demographic studies further suggest that future concentrations of older persons are likely to develop in suburban fringe areas such as Weymouth Township, Golant, *supra* at 19. Because the concept of "general welfare" in land use regulation necessarily encompasses regional, as well as local needs, *see Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 177–178; *Kunzler v. Hoffman, supra,* 48 *N. J.* at 287–288; *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough, supra,* 42 *N. J.* at 566; *Borough of Cresskill v. Borough of Dumont,* 15 *N. J.* 238, 247–249 (1954); *Duffcon Concrete Products, Inc. v. Borough of Cresskill,* 1 *N. J.* 509 (1949), it is appropriate to consider regional needs in evaluating the relationship of a municipal zoning ordinance to the "general welfare."

[10]Since we find the ordinances valid as exercises of the zoning power, we need not consider whether they would be valid either as exercises of the municipal power to regulate trailer camps under *N. J. S. A.* 40:52–1, 2 (*see, e. g., Edwards v. Mayor & Council of Moonachie,* 3 *N. J.* 17 (1949)) or under the general delegation of police power, *N. J. S. A.* 40:48–2 (*see Napierkowski v. Gloucester Tp., supra,* 29 *N. J.* 481).

regulation of the *use* of land, and hence does not constitute a valid exercise of the zoning power, because regulation of the *physical use* of property is the only proper function of municipal land use legislation. *Taxpayers Ass'n of Weymouth Tp., Inc. v. Weymouth Tp., supra,* 125 *N. J. Super.* at 380–381. *Accord, Shepard v. Woodland Tp. Comm.,* 135 *N. J. Super.* 97, 99; *Hinman v. Planning & Zoning Comm'n,* 26 *Conn. Supp.* 125, 214 *A.* 2d 131 (C. P. 1965); *Contra, Maldine v. Ambro,* 36 *N. Y.* 2d 481, 369 *N. Y. S.* 2d 385, 330 *N. E.* 2d 403 (Ct. App. 1975) appeal dismissed 423 *U. S.* 993, 96 *S. Ct.* 419, 46 *L. Ed.* 2d 367 (1975). Although several of the above decisions found such ordinances to be beyond the power of pertinent enabling acts, we reach a different conclusion.

Admittedly, zoning is not a panacea for all social, cultural and economic ills especially where they are unrelated to the use of land. *Vickers v. Gloucester Tp., supra,* 37 *N. J.* at 261–62 (Hall, J., dissenting); *Molino v. Mayor & Council of Glassboro,* 116 *N. J. Super.* 195, 201 (Law Div. 1971). Furthermore, zoning ordinances which bear too tenuous a relationship to land use will be stricken as exceeding the powers delegated to municipalities by the enabling act. Thus, zoning may not be used to regulate family life, *Kirsch Holding Co. v. Manasquan, supra,* 59 *N. J.* 241,[11] to protect local commercial establishments from undesired competition, *179 Duncan Ave. Corp. v. Jersey City Bd. of Adjustment,* 122 *N. J. L.* 292 (Sup. Ct. 1939), or to prevent whole classes of people from residing within a community, *e. g., United States v. City of Black Jack,* 508

---

[11] *Kirsch* was decided on constitutional grounds and may, to that extent, have been undermined by the subsequent decision in *Belle Terre v. Boraas, supra,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 39 *L. Ed.* 797, upholding a similar ordinance. Nevertheless, as Justice Hall noted, *id.* 59 *N. J.* at 249–51, the case could have been decided on the ground that the ordinance exceeded the powers delegated by the zoning enabling act. *Cf. Des Plaines v. Trotter,* 34 *Ill.* 2d 432, 216 *N. E.* 2d 116 (Sup. Ct. 1966).

*F.* 2d 1179 (8 Cir. 1974), *cert.* den. 422 *U. S.* 1042, 95 *S. Ct.* 2656, 45 *L. Ed.* 2d 694 (1975) (exclusion on the basis of race); *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 181–82 (exclusion of low and middle income families); *Molino v. Mayor & Council of Glassboro, supra,* 116 *N. J. Super.* 195 (limitation on apartment sizes in order to exclude families with children). The point at which the relationship between the principal purpose of a zoning ordinance and the regulation of land use becomes so tenuous as to place the ordinance beyond the limits of the zoning power cannot readily be determined in the abstract; it must be determined within the factual context of each case. We have no doubt, though, that the ordinances at issue in this case do bear a real and substantial relationship to land use.

 We first observe that as a conceptual matter regulation of *land use* cannot be precisely dissociated from regulation of *land users. Maldini· v. Ambro, supra,* 36 *N. Y.* 2d at 487–89, 369 *N. Y. S.* 2d at 391–92, 330 *N. E.* 2d at 407–408. Restrictions upon the use of land frequently restrict those who may utilize it. Thus, ordinances which regulate use by regulating identified users are not inherently objectionable.[12] As the New York Court of Appeals stated in *Maldini v. Ambro, supra* :[13]

That the "users" of the retirement community district have been considered in creating the zoning classification does not necessarily render the amendment suspect, nor does it clash with traditional "use" concepts of zoning. Including the needs of potential "users"

---

[12] We postpone consideration of the possible exclusionary effects of these ordinances until Part III *infra.*

[13] The court in that case held that a municipal zoning ordinance establishing a "Retirement Community District" as a special use did not violate a state enabling act which empowers municipalities to regulate the use of land for promotion of the "general welfare." *Maldini v. Ambro, supra,* 36 *N. Y.* 2d at 484, 369 *N. Y. S.* 2d at 388, 330 *N. E.* 2d at 405. *Accord, Biggs v. Huntington,* 49 *A. D.* 2d 744, 374 *N. Y. S.* 2d 306 (App. Div. 1975).

cannot be disassociated from sensible community planning based upon the "use" to which property is to be put. The line between legitimate and illegitimate exercise of the zoning power cannot be drawn by resort to formula, but as in other areas of the law, will vary with surrounding circumstances and conditions (*Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365, 387, 47 S. Ct. 114, 71 L. Ed. 303). Therefore it cannot be said that the Board acted unreasonably in this case in making special provision for housing designed for the elderly, one of the major groupings within our population.

[36 N. Y. 2d at 487, 369 N. Y. S. 2d at 391–92,<br>330 N. E. 2d 407–408; footnote omitted].

 In addition, we note that any rigid limitation of the zoning power keyed to the "physical use" test (expressed some years ago in *Skaf v. Zoning Bd. of Adjustment of Asbury Park*, 35 N. J. Super. 215, 223 (App. Div. 1955), and approved in Justice Hall's dissenting opinion in *Andrews v. Ocean Tp. Bd. of Adjustment*, 30 N. J. 245, 256, 257 (1959)), must be regarded as implicitly rejected by the consistent line of authority begun by the *Andrews* case, *supra*. These cases hold that the beneficent social purposes of a use (apart from its physical nature) will justify "special reasons" variances under N. J. S. A. 40:55–39(d). Specifically, see *DeSimone v. Greater Englewood Housing Corp. No. 1, supra*, 56 N. J. at 440, 442 (1970). Zoning for senior citizens' housing, for reasons amply set forth above, clearly involves special use qualities and characteristics which justify the conclusion that uses based on this classification are cognizable within the municipal zoning power (as, *e. g.*, through local endorsement of senior citizen communities as a permitted use in a zoning district).

 Similarly, we find the township's permission to establish mobile home parks for the exclusive use of the elderly to be a reasonable exception to the municipality's general ban against mobile homes. Activities conducted by one class of persons may have an impact on the surrounding community which differs from similar activities conducted by another class of users. *See, e. g., Pierro v. Baxendale, supra,* 20 N. J. 17; *Yanow v. Seven Oaks Park, Inc.*, 11 N. J. 341

(1953). By imposing a general ban on mobile homes within the municipality, Weymouth adopted a view — which has been sanctioned by our previous cases (*e. g.*, *Vickers v. Gloucester Tp.*, *supra*, 37 *N. J.* 232; *Napierkowski v. Gloucester Tp.*, *supra*, 29 *N. J.* at 481)[14] — that mobile homes have a potentially undesirable impact on the community. However, by creating an exception in the present case the municipality has indicated that it considers the detrimental impact of mobile homes to be outweighed by the advantages of meeting the unsatisfied regional housing needs of an important segment of the population. For instance, the municipality could reasonably have concluded that limiting occupancy to the elderly would substantially reduce the adverse impact of mobile home parks with regard to the demand for municipal services, traffic patterns and the economic, social and environmental well-being of the township. *See, e. g., N. J. Office on Aging, Impact of Retirement Communities*: *Summary Report* (1974); *Div. on*

---

[14]It may be, as urged by the Public Advocate, that the time is ripe for reconsideration by this Court of its past blanket tolerance of prohibitions upon mobile homes. We left this possibility open in *Vickers v. Gloucester Tp.*, *supra*, 39 *N. J.* at 249–50. We recognize both that the state of the law of zoning in New Jersey has changed since *Vickers* and *Napierkowski* (*see, e. g., Southern Burlington Cty. NAACP v. Mt. Laurel Tp.*, *supra; De Simone v. Greater Englewood Housing Corp. No. 1*, *supra*) and that the place of mobile homes in the housing market has changed, *see, e. g.,* Drury, *supra*. We recognize that today's modern "mobile homes" and "mobile home parks" are greatly improved in terms of size, appearance and maintenance features by comparison with what were known as "trailers" and "trailer camps" 20 years ago. *Shepard's, Mobile Homes and Mobile Home Parks* § 1.1 at 4, § 2.23 at 20–22 & *passim* (1975). We are also cognizant of the fact that a number of professional planners urged that such prohibitions lend themselves to improper exclusionary purposes. *N. J. Dept. of Community Affairs, Land Use Regulation*: *The Residential Land Supply* 12–13 (1972); Gibson, *Policy Alternatives for Mobile Homes* 33–37 (1972); *cf. Southern Burlington Cty. NAACP v. Mt. Laurel Tp.*, *supra*, 67 *N. J.* at 202 (Pashman, J. concurring). Nevertheless, we need not reach this issue today, and we should not be understood as having done so.

*Aging, N. J. Dept. of State, Considerations in Regard to Retirement Communities* (1964). Obviously, regulation of the user under these circumstances is an integral part of regulating the use.

Finally, reliance by the Appellate Division on the decision in *Bridge Park Co. v. Highland Park, supra,* 113 *N. J. Super.* 219 is misplaced. In that case, the court held that a municipality could not employ a zoning ordinance to prohibit conversion of existing garden apartments from rental units to condominium units because the ordinance did not concern regulation of land use. While *Bridge Park* may have been correctly decided (a matter we need not now consider), we find it to be distinguishable. The ordinance in that case did not alter the use of land which had been devoted to multifamily housing. Similarly, it did not affect the identity of the users in any fashion relating to the use of the land. Rather, it merely affected the location of title — a result which bears no relation to the functions of zoning.

## B

### Equal Protection

In addition to satisfying the requirements of *N. J. S. A.* 40:55-30 *et seq.,* a zoning ordinance must also satisfy the due process and equal protection requirements of the state and federal constitutions. *Roselle v. Wright, supra,* 21 *N. J.* at 409-410; *Katobimar Realty v. Webster,* 20 *N. J.* 114, 122-23 (1955).

We first consider the equal protection issue. The Appellate Division held that the Weymouth ordinances were violative of the fourteenth amendment to the federal constitution on the ground that they unlawfully discriminate on the basis of age.

The federal equal protection clause does not require that government treat all persons identically. It requires only that differences in treatment of persons similarly

situated be justified by an appropriate state interest; such distinctions may not be irrational or discriminate invidiously. *Chicago Police Dep't v. Mosley*, 408 U. S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212, 216 (1972). Under the conventional "two-tiered" analysis applied by the United States Supreme Court, the burden is on the party attacking the classification to show that it lacks a rational relationship to a legitimate state objective. The notable exception to this test occurs in situations where the classification involves "suspect" criteria or impinges upon "fundamental" rights. In these cases the burden is on the state to show that the classification serves a "compelling state interest." *San Antonio Independent School Dist. v. Rodriguez*, 411 U. S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16, 33 (1973), reh. den., 411 U. S. 959, 93 S. Ct. 1919, 36 L Ed. 2d 418 (1973); *Shapiro v. Thompson*, 394 U. S. 618, 658, 89 S. Ct. 1322, 22 L. Ed. 2d 600, 629 (1969) (Harlan, J., dissenting); *McDonald v. Bd. of Election*, 394 U. S. 802, 89 S. Ct. 1404, 22 L. Ed. 2d 739 (1969); "Developments in the Law — Equal Protection," 82 *Harv. L. Rev.* 1065, 1077 (1969).

The only rights which are "fundamental" in this regard are those expressly guaranteed or clearly implied by the federal constitution. *San Antonio Independent School Dist. v. Rodriguez, supra,* 411 U. S. at 33–34, 93 S. Ct. at 1296–1297, 36 L. Ed. 2d at 43. The Supreme Court has expressly rejected the contention that housing is a "fundamental" right protected by the fourteenth amendment. *Lindsey v. Normet,* 405 U. S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972). The high Court has also rejected the assertion that age is a "suspect" criterion.[15] *Massachusetts Bd. of Retire-*

---

[15]The label "suspect" attaches to the criteria for legislative classification which pose an exceptional danger of misuse to unfairly burdened classes of persons who share "immutable characteristics determined solely by accident of birth," *Frontiero v. Richardson*, 411 U. S. 677, 686, 93 S. Ct. 1764, 1770, 36 L. Ed. 2d 583, 591 (1973); or who are otherwise "saddled with such disabilities, or subjected to such a history of unequal treatment, or relegated to such a position

*ment v. Murgia,* —— *U. S.* ——, 96 *S. Ct.* 2562, 49 *L. Ed.* 520 (1976) (mandatory retirement age for state police); *Ramirez v. Weinberger,* 415 *U. S.* 970, 94 *S. Ct.* 1553, 39 *L. Ed.* 2d 867 (1974), aff'g mem. 363 *F. Supp.* 105 (N. D. Ill. 1973) (maximum age for receipt of federal welfare benefits); *Human Rights Party v. Secretary of State,* 414 *U. S.* 1058, 94 *S. Ct.* 563, 38 *L. Ed.* 2d 465 (1973), aff'g mem. 370 *F. Supp.* 921 (E. D. Mich. 1973) (minimum age to hold public office); *Gaunt v. Brown,* 409 *U. S.* 809, 93 *S. Ct.* 69, 34 *L. Ed.* 2d 71 (1972), aff'g mem. 341 *F. Supp.* 1187 (S. D. Ohio 1972) (minimum voting age); *cf. Oregon v. Mitchell,* 400 *U. S.* 112, 293–96, 91 *S. Ct.* 260, 27 *L. Ed.* 2d 272, 378–379 (1970) (Stewart, J., concurring and dissenting). This latter holding has been adopted by both this Court, *Wurtzel v. Falcey,* 69 *N. J.* 401, 404 (1976); *id,* 69 *N. J.* at 407 (Pashman, J., dissenting), and numerous other courts in a wide variety of contexts, *e. g., Manson v. Edwards,* 482 *F.* 2d at 1076, 1077 (6 Cir. 1973) (minimum age to hold public office); *United States v. Spencer,* 473 *F.* 2d 1009 (9 Cir. 1973) (age limits for compulsory military service); *United States v. Duncan,* 456 *F.* 2d 1401, 1404–05 (9 Cir. 1972), vacated on other grounds, 409 *U. S.* 814, 93 *S. Ct.* 161, 34 *L. Ed.* 2d 72 (1972) (minimum age for

---

of political powerlessness as to command extraordinary protection from the majoritarian political process," *San Antonio Independent School Dist. v. Rodriguez, supra,* 411 *U. S.* at 28, 93 *S. Ct.* at 1294, 36 *L. Ed.* 2d at 40; *see generally, Johnson v. Robinson,* 415 *U. S.* 361, 375 n. 14, 94 *S. Ct.* 1160, 39 *L. Ed.* 2d 389, 402–403 n. 14 (1974). The list of criteria to which the United States Supreme Court has applied these labels is extremely limited: race, *Loving v. Virginia,* 388 *U. S.* 1, 87 *S. Ct.* 1817, 18 *L. Ed.* 2d 1010 (1967); *McLaughlin v. Florida,* 379 *U. S.* 184, 85 *S. Ct.* 283, 13 *L. Ed.* 2d 222 (1964); alienage, *Graham v. Richardson,* 403 *U. S.* 365, 91 *S. Ct.* 1848, 29 *L. Ed.* 2d 534 (1971); national origin, *Oyama v. California,* 332 *U. S.* 633, 68 *S. Ct.* 269, 92 *L. Ed.* 249 (1948); illegitimacy, *Weber v. Aetna Cas. & Surety Co.,* 406 *U. S.* 164, 92 *S. Ct.* 1400, 31 *L. Ed.* 2d 768 (1972). The Court has strongly resisted extension of this list. *See, e. g., Kahn v. Shevin,* 416 *U. S.* 351, 94 *S. Ct.* 1734, 40 *L. Ed.* 2d 189 (1974) (sex); *San Antonio Independent School Dist. v. Rodriguez, supra* (wealth).

jury duty); *Perdido v. Immigration & Naturalization Service*, 420 *F.* 2d 1179 (5 Cir. 1969) (minimum age limits for exercise of certain rights of aliens); *Armstrong v. Howell*, 371 *F. Supp.* 48, 51–53 (D. Neb. 1974) (mandatory retirement); *Republican College Council of Pa. v. Winner*, 357 *F. Supp.* 739 (E. D. Pa. 1973) (minimum age for purchase of alcoholic beverages).

█ Since neither "fundamental" rights nor "suspect" criteria for classification are implicated in the present matter, plaintiffs have the burden of demonstrating that the classification herein lacks a rational basis. Such a classification must be sustained if it can be justified on any reasonably conceivable state of facts. *McGowan v. Maryland*, 366 *U. S.* 420, 426, 81 *S. Ct.* 1101, 1105, 6 *L. Ed.* 2d 393, 399 (1966). It does not matter that the classification may be mathematically imperfect or that it results in some inequities in practice. *Dandridge v. Williams*, 397 *U. S.* 471, 485, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491, 501–502 (1970), reh. den., 398 *U. S.* 914, 90 *S. Ct.* 1684, 26 *L. Ed.* 2d 80 (1970) ; *Lindsley v. Natural Carbonic Gas Co.*, 220 *U. S.* 61, 78, 31 *S. Ct.* 337, 55 *L. Ed.* 369, 377–79 (1911).

█ Plaintiffs have not demonstrated that the age limitations in the Weymouth Township ordinances lack a rational basis. Similar age restrictions on housing occupancy have been upheld in various contexts in other jurisdictions. *Riley v. Stoves*, 22 *Ariz. App.* 223, 526 *P.* 2d 747 (Ct. App. 1974) (enforcement of restrictive covenants); *Maldini v. Ambro*, *supra* (zoning); *Parrino v. Lindsay*, 29 *N. Y.* 2d 30, 323 *N. Y. S.* 2d 689, 272 *N. E.* 2d 67 (Ct. App. 1971) (rent increase exemption for elderly tenants) ; *Marino v. Ramapo*, 68 *Misc.* 2d 44, 326 *N. Y. S.* 2d 162, 183–85 (Sup. Ct. 1971) (federally subsidized housing); *see also* 12 *U. S. C. A.* § 1701q(d)(4) and 42 *U. S. C. A.* § 1485(d)(3) fixing age related occupancy requirements for certain federally subsidized housing programs for the elderly.

The choice of 52 as the cutoff age for occupancy is necessarily somewhat arbitrary. That some minimum age must be designated is inherent in the concept of a planned housing development for the elderly. Any choice of a specific figure inevitably excludes some persons who might plausibly be admitted and includes others who might plausibly have been excluded. The specification is a legislative judgment which ought not be disturbed by the judiciary unless it exceeds the bounds of reasonable choice. *Belle Terre v. Boraas, supra,* 416 *U. S.* at 9, 94 *S. Ct.* at 1541, 39 *L. Ed.* 2d at 803–804. The point was aptly stated by Mr. Justice Holmes nearly 50 years ago:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions to mark where the change takes place. Looked at by itself without regard to the necessity behind it, the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or to the other. When it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.
>
> > [*Louisville Gas Co. v. Coleman,* 277 *U. S.* 32, 41, 48 *S. Ct.* 423, 72 *L. Ed.* 770, 775 (1927) (Holmes, J., dissenting)].

*See also Oregon v. Mitchell, supra,* 400 *U. S.* at 294, 91 *S. Ct.* at 349, 27 *L. Ed.* 2d at 379 (Stewart J., concurring and dissenting). Though the elderly are commonly defined as those persons approximately 65 years old, it cannot be said that 52 is unreasonable or without a factual basis. As we have already noted, many persons who reach this age experience a decline in their net income. In addition, the median age at which men and women become grandparents is now only 57 and 54 respectively. *Hearings on Specialized Housing and Alternatives to Institutionalization Before a Subcomm. of the House Comm. on Gov't Operations, supra* at 7. Finally, an increasing number of Americans are retiring from active

employment while they are still in their 50's. *Id.* at 14. Therefore, we cannot say that the age limit in this particular case is so unreasonable that it violates principles of equal protection.[16]

 Neither plaintiffs nor the Appellate Division have suggested that the principles of equal protection under the New Jersey Constitution require a different result. *N. J. Const.* (1947), Art. I, §§ 1, 5; *Washington Nat'l Ins. Co. v. Bd. of Review*, 1 *N. J.* 545 (1949). We have adopted the federal two-tiered analysis with regard to "suspect" criteria, *Robinson v. Cahill*, 62 *N. J.* 473, 491 (1973), *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973), and have held that age, at least where the classification burdens the young rather than the old, is not a "suspect" criterion. *Wurtzel v. Falcey, supra,* 69 *N. J.* at 404; *id.,* 69 *N. J.* at 407 (Pashman, J., dissenting); *State in Interest of K. V. N.,* 60 *N. J.* 517 (1972), aff'g o. b. 116 *N. J. Super.* 580, 595–99 (App. Div. 1972).

 In *Robinson v Cahill, supra,* however, Chief Justice Weintraub, for the Court, questioned the usefulness

---

[16]Plaintiffs suggest that the distinction based upon age violates the New Jersey Law Against Discrimination, *N. J. S. A.* 10:5–1 *et seq.* and in particular *N. J. S. A.* 10:5–4, which provides:

All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

This broad declaration of principle must be understood in light of more particularized prohibitions of various types of discrimination. *See David v. Vesta Co.,* 45 *N. J.* 301 (1965). Prohibited forms of discrimination in housing and real property transactions are set forth in *N. J. S. A.* 10:5–12(f) – 10:5–12(k). None of these provisions bars discrimination on the basis of age. In view of the affirmative legislative policy of encouraging construction of housing for the aged (*see N. J. S. A.* 55:14I–1 *et seq*), we find the construction urged by plaintiffs implausible.

and practicality of distinguishing between "fundamental" rights and other rights. *Id.* 62 *N. J.* at 491–92. The Chief Justice concluded:

[W]e have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez*, that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. * * * Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.

*See generally, Massachusetts Bd. of Retirement v. Murgia, supra,* —— *U. S.* ——, 96 *S. Ct.* 2566, 49 *L. Ed.* 2d 527 (Marshall, J., dissenting) and *Abrahams v. Civil Service Comm'n,* 65 *N. J.* 61, 78–80 (1974), (Pashman, J., dissenting); *but see Worden v. Mercer Cty. Bd. of Elections,* 61 *N. J.* 325, 346 (1972). Thus, where an important personal right is affected by governmental action, this Court often requires the public authority to demonstrate a greater "public need" than is traditionally required in construing the federal constitution. Specifically, it must be shown that there is an "appropriate governmental interest suitably furthered by the differential treatment." *Collingswood v. Ringgold,* 66 *N. J.* 350, 370 (1975), appeal dismissed, 426 *U. S.* 901, 96 *S. Ct.* 2220, 48 *L. Ed.* 2d 826 (1976); *Robinson v. Cahill, supra,* 62 *N. J.* at 491–492; *Jackman v. Bodine,* 55 *N. J.* 371, 382–383, cert. den., 400 *U. S.* 849, 91 *S. Ct.* 39, 27 *L. Ed.* 2d 87 (1970); *Independent Electricians & Electrical Contractors' Asn'n v. N. J. Bd. of Examiners of Electrical Contractors,* 48 *N. J.* 413, 423–427 (1967); *Jones v. Falcey,* 48 *N. J.* 25, 39–40 (1966); *cf. Wurtzel v. Falcey, supra,*

69 *N. J.* at 411–412 n. 6; (Pashman, J., dissenting) *see generally,* Gunther, "Forward: In Search of Evolving Doctrine on a Changing Court: A Model for the Newer Equal Protection," 86 *Harv. L. Rev.* 1 (1972). Even under more traditional approaches, New Jersey has always required a real and substantial relationship between the classification and the governmental purpose which it purportedly serves. *Compare Dandridge v. Williams, supra,* 397 *U. S.* at 485, 90 *S. Ct.* at 1161, 25 *L. Ed.* 2d at 502 and *McGowan v. Maryland, supra,* 366 *U. S.* at 425–426, 81 *S. Ct.* at 1105, 6 *L. Ed.* 2d at 399 *with Independent Electricians & Electrical Contractors' Ass'n v. N. J. Bd. of Examiners of Electrical Contractors, supra,* 48 *N. J.* at 423–427; *Jones v. Falcey, supra,* 48 *N. J.* at 39–40; *Guill v. Mayor & Council of Hoboken,* 21 *N. J.* 574, 582–583; *Roselle v. Wright, supra,* 21 *N. J.* at 409–410.

As noted above, we have accorded the right to decent housing a preferred status under our State Constitution. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 179. Therefore, any governmental action which significantly impinges upon the ability of some class of individuals to obtain this necessity of life deserves close judicial scrutiny. Nevertheless, we are persuaded that the ordinances in question here satisfy the requirements of equal protection even when subjected to such scrutiny. The classification selected by the municipality is based upon real factual distinctions, and also bears a real and substantial relationship to the ends which the municipality seeks to accomplish by that classification.

## C

### *Due Process*

■ Plaintiffs also challenge the Weymouth Township ordinances on the grounds that they violate principles of substantive due process. The constitutional guarantee of substantive due process requires only that the operation of

a particular regulation not be unreasonable, arbitrary or capricious, and that the means selected bear a real and substantial relationship to a permissible legislative purpose. *Nebbia v. New York,* 291 *U. S.* 502, 525, 54 *S. Ct.* 505, 78 *L. Ed.* 940, 950 (1934); *Hutton Park Gardens v. West Orange Town Council,* 68 *N. J.* 543, 560–61 (1975); *Kirsch Holding Co. v. Manasquan, supra,* 59 *N. J.* at 251; *Roselle v. Wright, supra,* 21 *N. J.* at 409–410; *Katobimar Realty v. Webster, supra,* 20 *N. J.* at 122–23. In this particular case, the claim that the ordinances violate the due process clause is little more than a restatement of the contention that they contravene principles of equal protection. The same considerations which led us to conclude that the ordinances satisfy the latter constitutional requirement also warrant our conclusion that they do not offend principles of substantive due process. As we have already found, the age and occupancy provisions of the Weymouth Township ordinances do bear a real and substantial relationship to the ends sought, *i. e.,* the creation of a planned community for housing the elderly.

## III

Although the foregoing discussion disposes of all the issues raised by the parties or examined by the trial court, another issue requires consideration. This matter concerns the question whether senior citizen housing has an impermissible exclusionary effect. In this regard, the Public Advocate, appearing as *amicus curiae,* suggests that because zoning for senior citizen housing does pose such a threat, it should be sustained only within a comprehensive plan which specifically provides for a balanced housing stock. In addition, the Public Advocate urges that the case be remanded so that Weymouth Township may demonstrate that the ordinances in question are part of such a comprehensive plan.

The question of exclusionary zoning also implicates the effect of the Municipal Land Use Law, *L.* 1975, *c.* 291,

*N. J. S. A.* 40:55D-1 *et seq.* upon this litigation. This law, which went into effect on August 1, 1976, contains the following provisions relative to zoning for senior citizen housing:

Section 2:
. . . It is the intent and purpose of this act: . . .
(1) To encourage senior citizen community housing construction consistent with provisions permitting other residential uses of a similar density in the same zoning district. . . .
Section 52:
. . . A zoning ordinance may: . . .
(g) Provide for senior citizen community housing consistent with provisions permitting other residential uses of a similar density in the same zoning district.

We requested the parties here and in *Shepard v. Woodland Tp. Comm., supra,* to file supplemental briefs on the effect which the new law has on these cases. Having reviewed their responses, we consider here whether the law casts light, by analogy, on the considerations involved in the issue of exclusionary zoning and, in Part IV *infra,* whether the statute operates to bar implementation of the local zoning provisions with respect to the property involved in this litigation.

The peril to which our attention is drawn is a significant one. This Court recently had occasion to condemn zoning practices which deny a realistic opportunity to certain classes of people to live in desirable communities. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* 151. In that case, we determined the impropriety of attempts by municipalities to improve their financial position by selectively restricting new housing to categories of people who are net revenue producers, *i. e.,* those whose local tax contribution exceeds their demands upon locally financed governmental services. *Id.,* 67 *N. J.* at 185–86. We also disapproved of attempts to restrain increases in school expenditures by directly or indirectly excluding families with children. *Id.,* 67 *N. J.* at 182–83. Planned housing devel-

opments for the elderly can be exploited for either of these exclusionary purposes. In the short run at least, developments whose population is limited to the elderly may well be net revenue producers. *N. J. Office on Aging,* The Impact of Retirement Communities: Summary Report 47 (1974).[17] In addition, older persons are unlikely to have school age children. Some communities have reinforced this possibility by imposing specific prohibitions on the occupancy of dwelling units by families with children. *See, e. g., Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 168–69 ; *Shepard v. Woodland Tp. Comm., supra,* 135 *N. J. Super.* at 98 ; *Molino v. Mayor & Council of Glassboro, supra,* 116 *N. J. Super.* at 201–202. Furthermore, by zoning portions of its undeveloped land for planned communities for the aged, a municipality may prevent development of that land as housing for other, less welcome, segments of the population. *Schere v. Freehold Tp.,* 119 *N. J. Super.* 433, 437 (App. Div. 1971), certif. den. 62 *N. J.* 69 (1972), *cert.* den. 410 *U S.* 931, 93 *S. Ct.* 1374, 35 *L. Ed.* 2d 593 (1973).

Our concern for the exclusionary potential of these ordinances is not allayed by the trial testimony of Weymouth Township officials. They candidly admitted that in considering proposals to rezone the corporate defendant's property, they were motivated partly by a desire to obtain additional municipal revenues without placing concurrent demands upon locally financed governmental services. They also hoped to avoid the imposition of additional burdens on their overcrowded schools. Defendants' expert on housing for the aged pointedly characterized the effect of de-

---

[17]However, *see Div. of Aging, N. J. Dev't of State, Considerations in Regard to Retirement Communities* 2 (1964), which observes that in the long run, it is not clear that this remains true, as residents impose increased burdens on local health care, police and public transit facilities.

velopment permitted by the ordinances as "architectural birth control."

Concerns such as these for the exclusionary impact of zoning for the elderly were also recently manifested by the Governor and the Legislature in the events which preceded enactment of the above cited provisions of the Municipal Land Use Law relating to senior citizen zoning. In 1974, primarily in response to the Appellate Division decision in this case, the Legislature considered and adopted Assembly Bill No. 1338. This bill sought to amend *N. J. S. A.* 40: 55–32 (relating to the purposes of zoning) to declare that nothing in that section should be construed to prevent zoning regulations "from designating residential land use classifications limited to senior citizens . . . ." The sponsor's statement annexed to the bill recited that it was designed not only to overcome the Appellate Division decision in this case, but also to "authorize municipalities to establish their own districts in which senior citizens' housing is *permitted*."[18] (Emphasis added.)

Following the passage of the bill by the Legislature and shortly after this Court rendered its decision in *Mt. Laurel, supra,* Governor Byrne vetoed the bill on April 7, 1975. Among other reasons for this action, the Governor's veto message stated:

In addition, the bill does not provide adequate safeguards to prevent fiscal zoning. This could occur where a municipality zones a large area for senior citizens, not intending to fulfill an existing need for this type of housing, but rather as a device to exclude families with school age children. If land use regulations which limit occupancy to persons of a certain age are desirable and could be constitutionally designed, it is clear that the enabling legislation will

---

[18]This language betrays the apparently widespread misunderstanding that the Appellate Division decision rendered even permissive (as distinguished from restrictive) senior citizen housing illegal and also served to undermine the viability of existing senior citizen communities and, perhaps, even of restrictive covenants in the sale of their properties.

have to include a mechanism, absent from this bill, which would control abuse.

At the time Assembly Bill No. 1338 was vetoed, there was pending in the Senate the bill (S. 3054) which ultimately was enacted as the Municipal Land Use Law. This was to be the first comprehensive zoning legislation adopted in this State since 1928. Intended as a revision and codification of existing land use statutes and the judicial decisions which have construed them, the legislation is primarily a procedural reform statute. As originally introduced, the bill contained no reference to zoning for senior citizen housing. But floor amendments during debate resulted in the inclusion of the two provisions cited above. *L.* 1975, *c.* 291, §§ 2(1), 52(g).

While we shall consider the specific applicability of these provisions to the instant case shortly, it suffices, for immediate purposes, to indicate that this legislative response to the exclusionary threat of senior citizen housing falls far short of a fully considered and rational plan. For instance, it seems obvious that the seriousness of any exclusionary threat will depend upon the circumstances of each case, including in particular the relationship which the population, area, and available vacant land within the municipality bears to that within the areas occupied by the senior citizens communities. If the latter areas are small enough, it would not seem necessary that similar density housing be mandated in the same district. And if said areas were excessively large, the exclusionary impact would not necessarily be obviated by requiring that some similar housing, with no stated minimum of area or units, be permitted within the same zoning district. In either of these alternatives, moreover, it would seem that protection against exclusionary effect might, as well or better, be assured by requiring similar density in *other* districts in the municipality, rather than solely in the same district which allows senior citizen housing. Finally, it is con-

ceivable that by requiring uses of a similar density in the same zone as senior citizen developments, the restrictive clauses of Sections 2($l$) and 52(g) of the act may serve to impede rather than encourage development of senior citizen housing as was originally intended by these provisions.

For these reasons, we strongly suggest that the Legislature reconsider and clarify the language of these provisions. We also decline to accept them as persuasive guides to what the law should be deemed to have been previously, for purposes of disposing of this appeal.

■ We are satisfied, however, that the Public Advocate's recommendation that zoning for planned housing developments for the elderly be permitted only as part of a comprehensive municipal plan for a balanced housing stock presents a reasonable mechanism for averting the potentially exclusionary effects of such zoning. *See, e. g., Retirement Community Full Disclosure Act, N. J. S. A.* 45:22A–1 *et seq.;* Assembly Bill No. 1338 (vetoed April 7, 1975). Nonetheless, we believe that it is unnecessary to remand this case for further hearings as the Public Advocate urges.

■ Nothing stated above warrants the conclusion that zoning for planned housing developments for the elderly is presumptively invalid as exclusionary. It may be used for improper exclusionary purposes, but it also has valid nonexclusionary uses. Our decision in *Mt. Laurel* requires developing municipalities to provide, by their land use regulations, the opportunity for an appropriate variety and choice of housing for all categories of persons who may desire to live there. *Id.,* 67 *N. J.* at 179. This task would be impossible if the municipality could not design its land use regulations to provide for the unsatisfied housing needs of specific, narrowly defined categories of people. While we were specifically concerned in *Mt. Laurel* with the needs of younger families with children, the elderly are also a segment of the population whose needs and desires are appropriate considerations for municipal land use planning.

294

Therefore, to the extent that such needs exist, planned housing developments for the elderly may serve an inclusionary, rather than exclusionary function. *Accord, Maldini v. Ambro, supra,* 36 *N. Y.* at 485–486, 369 *N. Y. S.* 2d at 389–90, 330 *N. E.* 2d at 406.

Furthermore, as suggested above, the true character of this zoning device must be assessed against the background of general land use regulation by the municipality. If it substantially contributes to an overall pattern of improper exclusion, the fact that the ordinance may also benefit the elderly is neither an excuse nor a justification to sustain a challenge to a zoning provision.[19] In the present case, though, plaintiffs have not attacked the overall pattern of land use regulation adopted by Weymouth Township as improperly exclusionary. They did not try the case on any such theory, nor have they argued it on appeal before this Court. Indeed, the trial testimony of several individual plaintiffs suggests that their true objection to the ordinances may be that they are not sufficiently exclusionary. The record reveals little about the character of Weymouth Township, its present state of development, the extent of the unsatisfied housing needs in the municipality and the region at large, or the nature of its current land use regulations. We cannot say that plaintiffs have, even inadvertently, established a *prima facie* case of exclusionary zoning which would shift the burden to the municipality to justify its existing land use regulations. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 180–181. In so holding, we

---

[19]This was in fact the situation in the *Mt. Laurel* case itself. As part of its zoning scheme, Mt. Laurel Township designated an area for a "planned adult retirement community." In striking the zoning ordinances in that case, we specifically condemned the contribution of this provision to the overall exclusionary character of the Mt. Laurel ordinance. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 168–69; *cf. Schere v. Freehold Tp., supra,* 119 *N. J. Super.* at 437.

express no opinion as to whether the Weymouth Township zoning ordinances could survive such a challenge.[20]

To avert any misunderstanding, though, we reemphasize our concern about the exclusionary potential which zoning for senior citizen housing possesses. A pattern of exclusionary land use regulation cannot be rendered invisible to the judicial eye by camouflaging it with invocations of the legitimate needs of the elderly. The Court's failure to probe more deeply into the possible exclusionary effect of similar

---

[20]In *Mt. Laurel* we noted that certain types of zoning restrictions may be so inherently exclusionary as to be deemed presumptively illegal, even absent a specific showing that the municipality failed to satisfy its share of unmet regional housing needs. *Id.*, 67 *N. J.* at 183. The presumption of illegality is raised as to such a restriction by simply showing that a significant portion of the remaining undeveloped land in the municipality is subject to the restriction. We have held that certain restrictions calculated to limit the housing opportunities for families with children fall within this category. These include both direct restrictions on the number of children who may reside in a dwelling unit and indirect restrictions in the form of limitations upon the number of bedrooms which a dwelling unit may contain. *Id.* at 183; *Molino v. Mayor & Council of Glassboro*, 116 *N. J. Super.* 195 (Law Div. 1971).

The Weymouth Township ordinances in question do not directly limit the number of children who may live in a dwelling unit in the "Trailer and Mobile Home Park District," as, for example, did the Mt. Laurel ordinance. Ordinance No. 172–1971 does, however, provide:

*SECTION XXII. LIMITATIONS.*
There shall be not more than twenty per cent (20%) of trailers with more than two (2) bedrooms in any stage, expansion or section of the trailer park.

Were it shown that the property to which this restriction applied constituted a *significant portion* of the remaining undeveloped land in the municipality suitable for residential development, the provision would be presumptively invalid. The present record does not reveal what portion of the undeveloped land in the township suitable for residential uses is included in the Trailer and Mobile Park District. Therefore, it does not permit us to conclude that even this minimal burden has been borne by plaintiffs. Because Section XXII has not been shown to be presumptively invalid, we have no occasion to consider at this time what justifications, if any, would suffice to overcome a presumption of invalidity.

ordinances should not be understood to be the product of blindness to their potentially exclusionary character, but only the consequence of plaintiffs' decision not to try the case on that legal theory.

## IV

Finally, we consider the specific applicability of the Municipal Land Use Law to the instant case, *i. e.,* whether the ordinances under review are violative of the senior citizens zoning provisions of the Municipal Land Use Law, and, if so, whether they are applicable to the intended mobile home project of the defendant property owner.

It would appear likely that Ordinances Nos. 171 and 172 are not in compliance with Sections 2(*l*) and 52(g) of the new law. Those provisions indicate that where a zoning ordinance establishes a district in which senior citizen communities are a permitted use, the ordinance must also allow housing of similar density for some other residential use in the same district. Under the Weymouth Township ordinances, as described above, there is no provision for single family residences in the Trailer and Mobile Home District which have a permissible density similar to the 5000 sq. ft. minimum permitted for senior citizen homes. In fact, residences in Trailer and Mobile Home Districts *other than* for "elderly families" are required to be on lots of 20,000 sq. ft. or greater.[21]

Notwithstanding this apparent conflict, we conclude that the above provisions of the Municipal Land Use Law are not controlling for purposes of this case. As noted previously, the defendant property owner submitted an

---

[21]This is the requirement for single family residences in R–A Rural Agricultural Districts, under Art. IV, Sec. 402 of Ordinance No. 144. There is permitted in Trailer and Mobile Home Districts any use allowed in an R–A District, as well as mobile homes for senior citizens.

application for construction of a senior citizen mobile home park shortly after the adoption of Ordinances Nos. 171 and 172. Section 81(c) of the new law provides that "All applications for development made pursuant to lawful authority preceding the effective date of this act may be continued." Section 81(a) then permits "any municipality regulating development prior to the effective date of this act" pursuant to prior acts "to continue to exercise such authority" for a period of six months after the effective date of the act or until such time as it exercises the authority delegated by the act, whichever is shorter. Reading these sections in *pari materia* we have no doubt that they were intended to allow municipalities sufficient time in which to bring their zoning ordinances into conformity with the new act and, at the same time, to protect the integrity of pending applications. Therefore, it seems clear that if an application for a developmental use was filed prior to the effective date of the act or until such time as it exercises the authority existing law, the application may be granted and implemented (in accordance with the regulations in effect under Section 81(a)), notwithstanding apparent conflicts with the Municipal Land Use Law.

For the reasons set forth at length in Part II *supra,* we have determined that the use sought in the instant case was a valid one under preexisting law. Consequently, nothing contained in the new law bars defendants' right to a reversal of the Appellate Division decision.

## V

In summary, we hold that in zoning for planned housing developments for the elderly, Weymouth Township did not exceed the authority granted it by the zoning enabling act, *N. J. S. A.* 40:55–30 *et seq.,* and did not violate constitutional principles of due process or equal protection. We also hold that plaintiffs, on the present record, have not proven the existence of spot zoning, an illegal conspiracy or a pattern of illegally exclusionary practices.

Finally, we conclude that defendant property owner's rights are not subject to the provisions concerning zoning for senior citizen housing contained in the newly enacted Municipal Land Use Law. We therefore reverse the judgment of the Appellate Division.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.