NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1400-23

BLACKRIDGE REALTY, INC.,

       Plaintiff-Appellant,

v.

THE CITY OF LONG BRANCH,
and 290 OCEAN, LLC,

       Defendants-Respondents,

and

JAMES and CHRISTINE FUSCO,
286 OCEAN AVENUE, LLC, and
OCEAN AVENUE 290
ASSOCIATES, LLC,

       Defendants.

_____

> APPROVED FOR PUBLICATION
>
> **March 6, 2025**
>
> **APPELLATE DIVISION**

Argued February 3, 2025 – Decided March 6, 2025

Before Judges Sabatino, Berdote Byrne, and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-0190-21.

Arnold C. Lakind argued the cause for appellant (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Arnold C. Lakind, on the briefs).

Louis N. Rainone argued the cause for respondent City of Long Branch (Rainone Coughlin Minchello, LLC, attorneys; Louis N. Rainone, Brian P. Trelease, and Christopher D. Zingaro, of counsel and on the brief).

Matthew N. Fiorovanti argued the cause for respondent 290 Ocean, LLC (Giordano, Halleran & Ciesla, PC, attorneys; Matthew N. Fiorovanti and Michael A. Bruno, of counsel; Matthew N. Fiorovanti, on the brief).

The opinion of the court was delivered by

BERDOTE BYRNE, J.A.D.

Blackridge Realty, Inc. ("Blackridge") challenges the legality of an amendment ("Plan Amendment") to the City of Long Branch's ("City") Oceanfront-Broadway Redevelopment Plan ("Redevelopment Plan") and a two-million-dollar payment made by redeveloper 290 Ocean, LLC ("290 Ocean") to the City as part of its redevelopment agreement.

The land subject to this appeal is part of an area the City deemed in need of redevelopment ("Redevelopment Area") pursuant to N.J.S.A. 40A:12A-5 of the Local Redevelopment and Housing Law ("LRHL"), N.J.S.A. 40A:12A-1 to -49. The Redevelopment Plan, adopted in 1996, provides guidelines for development within the Redevelopment Area and procedures for amending the

Redevelopment Plan. In 2020, 290 Ocean proposed a redevelopment project to the City that would require an amendment to the Redevelopment Plan. The resulting Plan Amendment relaxed several previous restrictions contained within the original Redevelopment Plan. The City's planner, City council, and mayor all approved the Plan Amendment, finding it consistent with the City's Master Plan and in the City's best interests.

The City and 290 Ocean then negotiated a developer agreement on December 14, 2020, which included a provision requiring 290 Ocean to pay a two-million-dollar fee to the City. Soon after the Plan Amendment was adopted and 290 Ocean's developer agreement with the City was finalized, Blackridge filed a Complaint in Lieu of Prerogative Writs challenging the Plan Amendment's legality and the payment. The trial court granted summary judgment to the City and 290 Ocean, concluding both the Plan Amendment and payment were lawful.

We conclude 290 Ocean's two-million-dollar payment was a lawful, negotiated fee intended to defray the City's costs as authorized in N.J.S.A. 40A:12A-8(f) of the LRHL. We specifically determine the LRHL does not impose any restrictions limiting payments to the recovery of costs the municipality will incur as a direct result of the redevelopment project, as long as the fee is negotiated at arm's length and collected to effectuate the purposes

3

of the LRHL and the City's Master Plan. We also conclude the Plan Amendment was a lawfully-enacted alteration to the Redevelopment Plan that did not amount to impermissible spot zoning, and Blackridge did not have designated developer status that would allow it to veto the Plan Amendment. Therefore, we affirm.

I.

On May 14, 1996, the City passed Ordinance 15-96, which adopted the Redevelopment Plan pursuant to N.J.S.A. 40A:12A-7 of the LRHL. The Redevelopment Plan, codified as sections 345-82 to -101 of the Code of the City of Long Branch ("Code"), established design guidelines for all developments located within the Redevelopment Area. See Long Branch, N.J., Code § 345-101(B). The Design Guideline Handbook 6 ("Handbook 6") acts as a corollary to the Redevelopment Plan and provides the land use and design specifications for all new development in the Beachfront South sector, the area relevant to this appeal.

In pertinent part, Handbook 6 provides the following requirements for all new construction in Beachfront South: (a) a maximum density of thirty dwelling units per acre; (b) a maximum distance between buildings of forty feet; (c) a maximum building coverage of thirty-five percent of the tract area,

which may be increased by fifty percent upon satisfaction of certain conditions; and (d) a maximum building height of eighty feet.

Section 345-98(A) of the Code provides a procedure for amending any portion of the Redevelopment Plan:

> The Redevelopment Plan may be amended from time to time by the City Council of the City of Long Branch, provided that, if amended after the disposition of any land in the Redevelopment Area, the modification must be consented to in writing by designated developers. Any amendments to the Redevelopment Plan shall be reviewed by the Planning Board of the City of Long Branch. After such review, the Planning Board shall make recommendations to the City Council, which may adopt the changes by ordinance. Such ordinance shall specify the relationship of the proposed changes or amendments to the City Master Plan and the goals and objectives of the Redevelopment Plan.
>
> [Long Branch, N.J., Code § 345-98(A).]

On October 14, 2020, the City council introduced Ordinance 23-20, which provided, "290 Ocean . . . has proposed a plan for the redevelopment of a portion of the Redevelopment Area located on Ocean Avenue and Ocean Boulevard, designated on the City Tax Map as Block 216, Lots 11, 12 and 24," and incorporated the proposed Plan Amendment to effect 290 Ocean's project. The Plan Amendment applied only to 290 Ocean's project and provided in pertinent part: (a) no maximum density restriction; (b) a maximum distance between buildings of sixty feet; (c) a maximum building coverage of fifty

5

percent; and (d) a maximum building height of one hundred feet. Ordinance 23-20 also provided the planning board's conclusion that the Plan Amendment was consistent with the City's Master Plan, and the mayor's and City council's conclusions the Plan Amendment was in the City's best interest. After proper notice and public hearings, Ordinance 23-20 was reproduced in the identical Ordinance 26-20, which was unanimously passed on December 9, 2020, approving 290 Ocean's project and amending the Redevelopment Plan. See Long Branch, N.J., Ordinance 26-20 (Dec. 9, 2020).

Also on December 9, 2020, the City council adopted Resolution 243-20 designating 290 Ocean as a redeveloper and authorizing 290 Ocean's negotiated redevelopment agreement with the City. Per the agreement, 290 Ocean was required to pay the City a one-time fee of two million dollars, which the City agreed was to be used to "benefit the City's redevelopment areas" and serve as "an additional community benefit" to address any impacts borne by the City relating to the redevelopment.

On August 25, 2021, several months after Blackridge filed its Complaint, the City adopted capital Ordinance 20-21, authorizing the appropriation of the entire two-million-dollar payment from the Developer Contributions Trust Fund to renovate and expand the City's senior center. Long Branch, N.J., Ordinance 20-21 (Aug. 25, 2021).

6

Blackridge filed a Complaint in Lieu of Prerogative Writs against the City and 290 Ocean on January 15, 2021, which it amended on January 22, 2021. Although the Complaint consisted of six counts, only Counts I, II, and IV are the subjects of this appeal. Count I alleged the two-million-dollar payment included in the redevelopment agreement between the City and 290 Ocean was unlawful because it was ultra vires, lacked "standards to determine the amount of the $2 [million] fee in any ordinance," was "unrelated to the impact of the development of [290 Ocean's project]," had "no relationship to the 'costs of the redevelopment entity' as those terms are used in N.J.S.A. 40A:12A-8(f)," and was not authorized by the LRHL. Count II alleged the Redevelopment Plan could not have been amended without Blackridge's written consent because Blackridge was a "designated developer" with authority to veto any plan amendment pursuant to Code section 345-98(A). Count IV alleged the Plan Amendment amounted to impermissible spot zoning "insofar as it extended significant benefits to the owner of [the subject] lot[] unavailable to others" with "no legitimate purpose within the Municipal Land Use Law [("MLUL")] to justify the different treatment of the [land subject to 290 Ocean's project] from other properties within the Redevelopment Area."

## II.

Blackridge raises three issues on appeal. It posits: (1) the two-million-dollar payment the City received from 290 Ocean was improper because it lacked a rational nexus to 290 Ocean's redevelopment project, it was obtained through negotiation, and it was a "pay[ment] for approvals under an unreviewable assessment regime"; (2) the City was required to obtain Blackridge's written consent before adopting the Plan Amendment; and (3) the Plan Amendment amounts to impermissible spot zoning.

In considering these arguments, we review the trial court's grant of summary judgment de novo. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). We consider the factual record, and reasonable inferences that can be drawn from those facts, "in the light most favorable to the non-moving party" to decide whether "the moving party [was] entitled to judgment or order as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995); see also R. 4:46-2(c).

Municipal actions have a presumption of validity and reasonableness, and this court will not "'pass on the wisdom of the ordinance'" as "'that is exclusively a legislative function.'" N.J. Realtors v. Township of Berkeley, 479 N.J. Super. 379, 400 (App. Div. 2024) (quoting Timber Glen Phase III, LLC v. Township of Hamilton, 441 N.J. Super. 514, 523 (App. Div. 2015)).

A-1400-23

This presumption of validity may be overcome if the party challenging the action proves it is arbitrary, capricious, or unreasonable.  Ibid.

We review the meaning of a statute or ordinance de novo.  Malanga v. Township of West Orange, 253 N.J. 291, 311 (2023).  "As a general principle, a municipal ordinance is afforded a presumption of validity[] and . . . will not be overturned unless it is found to be arbitrary and capricious or unreasonable, with the burden of proof placed on the plaintiff challenging the action."  Grabowsky v. Township of Montclair, 221 N.J. 536, 551 (2015).  "A determination predicated on unsupported findings is the essence of arbitrary and capricious action."  Borough of Glassboro v. Grossman, 457 N.J. Super. 416, 435-36 (App. Div. 2019) (quoting Bryant v. City of Atlantic City, 309 N.J. Super. 596, 610 (App. Div. 1998)).

A hallmark of this standard is the principle that a "'[r]eviewing court[] should not be concerned over the wisdom of an ordinance'" and "'[i]f debatable, the ordinance should be upheld.'"  Griepenburg v. Township of Ocean, 220 N.J. 239, 253 (2015) (quoting Rumson Ests., Inc. v. Mayor & Council of Fair Haven, 177 N.J. 338, 350-51 (2003)); see also Bow & Arrow Manor, Inc. v. Township of West Orange, 63 N.J. 335, 343 (1973) ("It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it

differently . . . ."). A municipality challenged in the redevelopment context needs to produce "some reasonable basis for its legislative action" in order "to secure summary judgment." Downtown Residents for Sane Dev. v. City of Hoboken, 242 N.J. Super. 329, 338 (App. Div. 1990).

A. Whether the Two-Million-Dollar Payment was Lawful.

"The Legislature enacted the LRHL in recognition of persistent 'conditions of deterioration in housing, commercial and industrial installations, public services and facilities[,] and other physical components and supports of community life.'" Weeden v. City Council of Trenton, 391 N.J. Super. 214, 227 (App. Div. 2007) (quoting N.J.S.A. 40A:12A-2(a)); see also Malanga, 253 N.J. at 296 (stating the LRHL empowers municipalities to redevelop properties within their borders suffering from "obsolescence," "faulty arrangement," or an "obsolete layout" that, without redevelopment, remain "detrimental to the . . . welfare of the community" (omission in original) (quoting N.J.S.A. 40A:12A-5(d))).

Whereas the LRHL applies only in the redevelopment context, see N.J.S.A. 40A:12A-2(d), the MLUL "guide[s] the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." Weeden, 391 N.J. Super. at 228 (quoting N.J.S.A. 40:55D-2(a)). Although "the two statutes deal with

10

the same subjects of zoning and land development" and have been construed in pari materia in certain contexts, see ibid., the plain language of the two statutes differs with respect to a municipality's ability to collect fees from developers or redevelopers.

N.J.S.A. 40:55D-42 of the MLUL permits municipalities to charge developers "the pro-rata share of the cost of providing only reasonable and necessary street improvements and water, sewerage and drainage facilities, and easements therefor, located off-tract but necessitated or required by construction or improvements within such subdivision or development." This language imposes a strict nexus between a developer's project and any payment required by the municipality and is "a codification of pre-MLUL cases which focused on the 'rational nexus' between the needs created by, and benefits conferred upon, the subdivision and the costs of the off-tract improvements." F & W Assocs. v. County of Somerset, 276 N.J. Super. 519, 527-28 (App. Div. 1994) (quoting Longridge Builders, Inc. v. Plan. Bd. of Princeton, 52 N.J. 348, 350 (1968); Divan Builders, Inc. v. Plan. Bd. of Wayne, 66 N.J. 582, 600 (1975)). Since the MLUL's codification, courts interpreting N.J.S.A. 40:55D-42 have "embraced this rational nexus requirement." Id. at 528 (internal quotation marks omitted). The MLUL further restricts any payment to only "reasonable and necessary"

11

improvements, specifically enumerating the types of improvements upon which the municipality may impose a pro-rata fee. N.J.S.A. 40:55D-42.

Unlike the MLUL, the LRHL contains no explicit nexus requirement regarding the amount of payment a municipality may charge a redeveloper to defray its costs associated with redevelopment. See N.J.S.A. 40A:12A-1 to -49. The statute instead empowers a municipality to "negotiate and collect revenue from a redeveloper to defray the costs of the redevelopment entity" in order "to carry out and effectuate the purposes of [the LRHL] and the terms of the [municipality's] redevelopment plan." N.J.S.A. 40A:12A-8(f). The statute's plain terms permit a municipality to "negotiate" any payment amount from a redeveloper without requiring a causal connection between the payment and the redeveloper's project, as long as the municipality demonstrates the payment will defray costs to the municipality associated generally with redevelopment. Ibid.

When interpreting statutory language, we "aim[] to effectuate the Legislature's intent." W.S. v. Hildreth, 252 N.J. 506, 518-19 (2023). The "'best indicator' of legislative intent 'is the statutory language.'" Id. at 519 (quoting State v. Lane, 251 N.J. 84, 94 (2022)). "We ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole."

12

DiProspero v. Penn, 183 N.J. 477, 492 (2005) (internal citation omitted). "If the Legislature's intent is clear from the statutory language and its context with related provisions, we apply the law as written." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 429 (2013).

The use of the word "negotiate" in the LRHL, a term missing from the MLUL, demonstrates the Legislature's intent to afford municipalities discretion in the amount of the payment. A leading dictionary defines "negotiate" as "to arrange for or bring about through conference, discussion, and compromise." Merriam-Webster's Collegiate Dictionary 830 (11th ed. 2014). The Legislature's use of the word "negotiate," failure to set forth a pro-rata or other formula for calculating the amount of payment, and failure to limit the payment to a specific sum or type of improvement demonstrates its conscious choice to afford municipalities discretion in the amount of the payment and its intended use. The language authorizing a municipality to "negotiate and collect revenue from a redeveloper to defray the costs of the redevelopment entity" is plain, unambiguous, and markedly different from the language set forth in the MLUL payment provision. Compare N.J.S.A. 40A:12A-8(f) with N.J.S.A. 40:55D-42.

If the Legislature had intended to impose the same or a similar "rational nexus" requirement on payments collected pursuant to the LRHL as is required

13

for fees demanded pursuant to the MLUL, it would have used similar language, having enacted the MLUL nearly twenty years prior to the LRHL. Compare L. 1975, c. 291, § 30 (codified at N.J.S.A. 40:55D-42), with L. 1992, c. 79, § 8 (codified at N.J.S.A. 40A:12A-8(f)). See also In re Proposed Constr. of Compressor Station (CS327), 258 N.J. 312, 325 (2024) ("[We] . . . may not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" (second alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002))); DiProspero, 183 N.J. at 493 ("Ordinarily, we are enjoined from presuming that the Legislature intended a result different from the wording of the statute or from adding a qualification that has been omitted from the statute."); Murray v. Plainfield Rescue Squad, 210 N.J. 581, 596 (2012) ("We are charged with interpreting a statute; we have been given no commission to rewrite one."); Mazzacano v. Est. of Kinnerman, 197 N.J. 307, 323 (2009) ("We cannot, and should not, 'rewrite a plainly-written enactment of the Legislature' or 'write in an additional qualification which the Legislature pointedly omitted.'" (quoting DiProspero, 183 N.J. at 492)). Indeed, our Supreme Court has decreed if a statute's failure to provide for a specified scenario constitutes an oversight, "any corrective measure must be taken by the Legislature." Murray, 210 N.J. at 596.

The plain language of the LRHL, and specifically the inclusion of the term "negotiate," demonstrates the Legislature's purposeful intent to confer broad authority to municipalities in negotiating with redevelopers to achieve the goals of the redevelopment statute and defray a municipality's general costs associated with redevelopment. N.J.S.A. 40A:12A-8(f).

Blackridge's reliance on Britwood Urban Renewal, LLC v. City of Asbury Park, 376 N.J. Super. 552 (App. Div. 2005) is misplaced as Britwood does not dictate a contrary result. In Britwood, Asbury Park implemented a redevelopment plan affecting the plaintiff's land. Part of the plan required Asbury Park to make several off-site improvements. The plaintiff, who was not a redeveloper and purchased the property prior to the enactment of the redevelopment plan, elected to improve its own property and sought approval from the Asbury Park planning board. The planning board refused to approve the plaintiff's final site plan unless the plaintiff agreed to make pro-rata contributions for the off-site improvements required by the redevelopment plan.

We concluded that although N.J.S.A. 40A:12A-8(f) gave "specific authorization . . . permit[ting] the redevelopment entity to collect funds from a redeveloper," Asbury Park's excises imposed upon the plaintiff were unlawful because the plaintiff was not a redeveloper. Id. at 564-66. We also noted

15

N.J.S.A. 40:55D-42 of the MLUL did not permit Asbury Park's excises on the plaintiff because the plaintiff's project did not contribute to the need for the off-site improvements described in the redevelopment plan as required by the MLUL, nor was there a "causal relationship between plaintiff's renovation and the need for the off-site improvement" to the effect where the off-site improvements were "'a direct consequence' of plaintiff's renovation project." Id. at 568 (quoting N.J. Builders Ass'n v. Mayor & Twp. Comm. of Bernards, 108 N.J. 223, 237 (1987)); see also F & W Assocs., 276 N.J. Super. at 527-28. Britwood supports our conclusion because we specifically recognized a municipality's ability to impose payment obligations upon redevelopers flowed from its authority to negotiate contracts pursuant to the LRHL. See 376 N.J. Super. at 564.

Unlike the MLUL provision, the plain language of N.J.S.A. 40A:12A-8(f) expressly permits redevelopment entities to "negotiate" payment with developers to "defray the costs" of the municipality, whereas the amount imposed on a developer by municipalities operating pursuant to N.J.S.A. 40:55D-42 of the MLUL is non-negotiable as it is determined by the cost of the off-tract improvement and the developer's pro-rata share of that cost. Compare N.J.S.A. 40A:12A-8(f) with N.J.S.A. 40:55D-42.  290 Ocean is a designated redeveloper for the City's Oceanfront-Broadway Redevelopment

A-1400-23

Plan and the City was permitted to "negotiate and collect revenue" from 290 Ocean to defray its costs "[i]n order to carry out and effectuate the purposes of [the LRHL] and the terms of the [Oceanfront-Broadway Redevelopment Plan]." See N.J.S.A. 40A:12A-8(f).

The two-million-dollar negotiated payment satisfies this requirement because the City passed Ordinance 20-21 authorizing the payment's use to renovate the City's senior center, a group impacted by the redevelopment of the City's waterfront. This is in conformity with the Redevelopment Plan's "overall goal [of] bring[ing] about a compact and integrated ensemble of public and private places that support year-round uses related to living, working[] and recreation[,] and visitation," and the LRHL's purpose of addressing "deterioration in . . . public services and facilities." N.J.S.A. 40A:12A-2(a).

To be sure, regardless of which statute applies, we recognize the need for transparency with respect to any municipality's negotiated payment from a redeveloper, if only to prevent allegations of abuse. Transparency avoids the appearance that "'[a]pprovals would be granted or withheld depending upon the board members' arbitrary sense of how much an applicant should pay.'" See Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adjustment, 397 N.J. Super. 335, 359 (App. Div. 2008) (quoting Nunziato v.

17

Plan. Bd. of Edgewater, 225 N.J. Super. 124, 134 (App. Div. 1988)). It is critically important when a municipality provides a benefit to a redeveloper that the public is assured the negotiations proceeded at arms-length. Transparency is fundamental to maintain public trust, to ensure accountability, and to prevent the appearance of favoritism or impropriety in government decision-making. See Jersey Pub. Co. v. N.J. Expressway Auth., 124 N.J. 478, 492 (1991) (emphasizing the necessity of transparency to uphold public trust and confidence in governmental processes). When public resources, in whatever form, are conferred upon private entities, the public has a right to understand the rationale, the terms, and the potential impact of these decisions; it is not merely procedural. Rather, it fosters informed public discourse, enables effective oversight, and safeguards against undue influence. Quite simply, clear disclosure engenders confidence in our municipal governance.

As we have previously noted, "[i]n dealing with the public, government[s] must 'turn square corners.'" F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426 (1985) (quoting Gruber v. Mayor and Twp. Comm. of Raritan, 73 N.J. Super. 120, 127 (App. Div.), aff'd, 39 N.J. 1 (1962)). Municipalities contracting with redevelopers "may not conduct [themselves] so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner," but rather must ensure "[i]ts primary

18

obligation is to comport itself with compunction and integrity." Id. at 427. Lack of transparency may very well result in the legal conclusion that a municipality's actions did not turn square corners and were, therefore, arbitrary and capricious. Although not required by the LRHL, such an obligation may be fulfilled by ensuring any negotiated fees collected to "defray the costs of the redevelopment entity" pursuant to N.J.S.A. 40A:12A-8(f) are identified for a specific purpose, either through ordinance or public notice. However, because "the Legislature [is] free to decide" what elements to include in a statute and, perhaps more importantly, what elements not to include, we are mindful we may not "rewrite the law and add an element that the Legislature did not include." State v. Munafo, 222 N.J. 480, 490-91 (2015).

Here, we discern no lack of transparency with respect to the negotiated payment. The requested payment of two million dollars was made to the municipality to defray a portion of a community center that would ultimately benefit the senior citizens of Long Branch. It was placed in the Developer Contributions Trust Fund, not a general fund. The senior center is to be in close proximity to the structure the redeveloper sought to build, and either

19

within the Redevelopment Area or abutting it.[1]  Since the contribution was made to support the redevelopment within the municipality, it is permitted pursuant to the LRHL.

Blackridge's arguments are belied by the record before us.  The City was transparent in enacting the Plan Amendment.  Specifically, the proposed Plan Amendment was the subject of public hearings—in which Blackridge participated, but did not raise the arguments it raises before us—and included testimony from the City's planner in support of the Plan Amendment.  The appointment of the redeveloper and the adoption of the redevelopment agreement was the subject of another ordinance and the proposed use of the two-million-dollar payment was the subject of a capital ordinance that specified its use for a senior center.  We discern no reason to disturb the ruling of the trial court and affirm its decision as to Count I, concluding the negotiated two-million-dollar payment was lawful, consistent with N.J.S.A. 40A:12A-8(f) of the LRHL.

---

[1]  The parties dispute whether the proposed senior center is within the Redevelopment Area or merely near it.  The distinction has no impact upon our ruling.

A-1400-23

B. Whether Blackridge's Consent was Required Before Adopting the Plan Amendment.

Blackridge also argues the trial court erred in awarding summary judgment after concluding it was no longer a "designated developer" entitled to vote on the Plan Amendment because its status as a designated developer did not end when it concluded its redevelopment project. As an initial matter, we note that during the Plan Amendment's public comment stages, Blackridge was represented by counsel who presented objections to the Plan Amendment ordinance, but did not raise this issue.[2]

We review de novo whether Blackridge is a "designated developer" of the Redevelopment Plan, as codified in section 345-82 to -101 of the Code. See Keyworth v. CareOne at Madison Ave., 258 N.J. 359, 379 (2024) ("[T]o the extent that the [trial] court's decision involves a question of statutory interpretation, we review the determination de novo."). "When a statute is silent" as to a particular issue, we must interpret that issue "in light of the Legislature's intent." See Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 459 (2009) (quoting Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 171 (2006)).

---

[2] At both the November 12, 2020 and November 24, 2020 City council meetings held for public comment on the Plan Amendment, Blackridge presented opposition to the Plan Amendment for reasons it set forth in letters sent to the mayor and City council. Those letters, however, are not included in the record.

"'[O]nly when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with the general statutory scheme,' will we turn to extrinsic tools to determine legislative intent." Compressor Station, 258 N.J. at 325 (alteration in original) (quoting Shelton, 214 N.J. at 429).

The term "designated developer"—that is, a developer from whom written consent must be received before the City may amend the Redevelopment Plan—is not expressly defined in the Code. The parties do not dispute Blackridge was a "designated developer" as defined by the contract between it and the City. The Code does not comment on whether or when an entity's "designated developer" rights expire. Because the Code is silent, we interpret section 345-95 in light of the Legislature's intent, see Ogborne, 197 N.J. at 459, accomplished by reading section 345-95 in context with other relevant portions of the Code. See DiProspero, 183 N.J. at 492. Pertinent to this analysis is section 345-94, which describes "[d]eveloper selection" in the context of an "[o]pen and competitive developer solicitation and designation process." See Long Branch, N.J., Code § 345-94. Utilizing this process, the City designates developers based on their contractual agreements with the City. Ibid.

Here, the agreement between the City and Blackridge ascribed Blackridge designated developer status and states "[t]his [a]greement shall terminate upon the earlier of the [c]ompletion of the [p]roject or five (5) years from its [e]ffective [d]ate."  Because Blackridge had completed its redevelopment project by the time the Plan Amendment was enacted, its agreement with the City had terminated, thereby extinguishing the City's obligation to obtain Blackridge's consent before amending the Redevelopment Plan.  Had Blackridge intended to maintain "designated developer" status in perpetuity, it could have negotiated a different meaning of the term in its redevelopment contract with the City.

C. Whether the Plan Amendment Amounts to Impermissible Spot Zoning.

Lastly, Blackridge argues the relaxation of certain original redevelopment plan details to benefit one redeveloper amounts to spot zoning. We disagree.

First, we dispel Blackridge's argument that the trial court wrongly failed to consider its expert's opinion when it concluded the Plan Amendment is not spot zoning, and decline to accept its argument that our decision in Jennings v. Borough of Highlands, 418 N.J. Super. 405 (App. Div. 2011) renders the trial court's ruling incorrect.  In Jennings, we held a trial court's outright refusal to allow expert testimony from a plaintiff alleging spot zoning "[runs] afoul of

23

giving a litigant a fair opportunity to prove the elements of the cause of action." 418 N.J. Super. at 426. <u>Jennings</u> is distinguishable as the trial court in this matter considered, but ultimately rejected, the opinion of Blackridge's expert by noting:

> To the extent that [Blackridge's expert] has provided the court with an analysis of what the facts show, with reference to spot zoning, the court has considered the report submitted, but it is noted that the court is not bound by [the expert's] conclusions on the question of whether the adoption of the amendment to the redevelopment plan constitutes spot zoning.

Accordingly, Blackridge is not correct in asserting it should be afforded an evidentiary hearing regarding the issue of spot zoning, as the trial court properly reviewed, but chose not to adopt, the evidence presented by Blackridge's expert. <u>See</u> <u>Medina v. Pitta</u>, 442 N.J. Super. 1, 24 (App. Div. 2015) ("'[A] party cannot defeat a motion for summary judgment merely by submitting an expert's report in his or her favor.'" (quoting <u>Brill</u>, 142 N.J. at 544)).

Substantively, a charge of spot zoning will withstand a motion for summary judgment if a genuine issue of fact exists as to whether a municipality "use[d] . . . [its] zoning power to benefit particular private interests rather than the collective interests of the community." <u>Taxpayers Ass'n of Weymouth Twp., Inc. v. Weymouth Township</u>, 80 N.J. 6, 18 (1976);

see also Jennings, 418 N.J. Super. at 425-26 ("Spot zoning occurs when a municipality seeks to relieve a particular property of the burden imposed by its zoning classification so as to benefit the lot owner or permit an incompatible use." (citing Cresskill v. Borough of Dumont, 15 N.J. 238, 249-51 (1954))). However, a zoning change does not amount to impermissible spot zoning if it serves a valid municipal purpose and is consistent with the municipality's land use Master Plan. See Trust Co. of N.J. v. Plan. Bd. of Freehold, 244 N.J. Super. 553, 561-67 (App. Div. 1990). "An ordinance enacted to advance the general welfare by means of a comprehensive plan" is not impermissible spot zoning "even if the ordinance was initially proposed by private parties and these parties are in fact its ultimate beneficiaries." Weymouth, 80 N.J. at 18; see also Gallo v. Mayor & Twp. Council of Lawrence, 328 N.J. Super. 117, 127-28 (App. Div. 2000) (holding the re-zoning of property to allow for a higher density to the benefit of a particular developer was not spot zoning because it was "part of a comprehensive plan to benefit the community . . . and . . . not simply enacted to benefit certain individuals").

Although the City's contention that spot zoning is inapplicable in redevelopment contexts is incorrect,[3] the trial court correctly found there existed no genuine issue of material fact supporting Blackridge's spot zoning charge. Ordinance 26-20 adopting the Plan Amendment certified "the Planning Board found and concluded that the [Plan Amendment] [was] consistent with the City's Master Plan" and "the Mayor and [City] Council [found] that the [Plan Amendment] [was] in the best interest of the City." The City's planner also provided deposition testimony that the Plan Amendment was consistent with the Master Plan. Moreover, the Plan Amendment's stated objective to promote the general welfare of the City further undermines Blackridge's spot zoning charge. See Weymouth, 80 N.J. at 18.

Finally, as we held in Gallo, it is immaterial that 290 Ocean is the only developer affected by the Plan Amendment as it is "part of a comprehensive

---

[3] Only the City—not 290 Ocean—makes this argument, and cites Kanter v. City of Passaic, 107 N.J. Super. 556 (Law Div. 1969) in support. Kanter, a Law Division case, is not binding on this court. Additionally, the City mischaracterizes Kanter's holding as the Law Division did not establish a brightline rule that spot zoning cannot exist in redevelopment areas, but rather held an "action of the municipal government in amending its own zoning ordinance must be read within the context of [the LRHL's predecessor] as to property within" a redevelopment area. 107 N.J. Super. at 564. In other words, a charge of spot zoning may be overcome if the zoning is within a redevelopment district and is consistent with the redevelopment plan by "harmoniz[ing] with an orderly growth of a new use for property in the respective locality." Ibid. (citation omitted).

plan to benefit the community . . . and . . . not simply enacted to benefit certain individuals." 328 N.J. Super. at 128. Blackridge's assertions that the Plan Amendment is part of an improper arrangement between the City and 290 Ocean cannot establish a genuine issue of material fact supporting its spot zoning charge that would survive summary judgment. See Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (holding "conclusory and self-serving assertions by one of the parties are insufficient to overcome [a summary judgment] motion").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division